COLUMBUS BROADCASTING COALITION, Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee,

WBNS TV, Inc., RadiOhio, Inc., Intervenors.

No. 73-1074.

United States Court of Appeals, District of Columbia Circuit.

Argued March 5, 1974.

Decided June 28, 1974.

Rehearing Denied Nov. 22, 1974.

---

Charles M. Firestone, Washington, D. C., with whom Albert H. Kramer and Frank W. Lloyd, III, Washington, D. C., were on the brief, for appellant.

Philip V. Permut, Counsel, Federal Communications Commission, with whom John W. Pettit, Gen. Counsel, and Joseph A. Marino, Associate Gen. Counsel, Federal Communications Commission, were on the brief, for appellee. R. Michael Senkowski, Counsel, Federal Communications Commission, also entered an appearance for appellee.

Daniel W. Toohey, Washington, D. C., with whom Thomas H. Wall and Richard D. Marks, Washington, D. C., were on the brief, for intervenors.

Before TAMM, LEVENTHAL and ROBINSON, Circuit Judges.

TAMM, Circuit Judge:

This is an appeal pursuant to 47 U.S.C. § 402(b)(6) (1970) challenging an order[1] of the Federal Communications Commission (hereafter "the Commission") granting license renewal for stations WBNS–AM, FM, and TV, Columbus, Ohio.[2] The basic issue raised is whether the Commission could reasonably find that appellant had not raised substantial and material issues of fact sufficient to demonstrate *prima facie* that license renewal would contravene the public interest. We hold that the Commission could so find and, accordingly, affirm the Commission's order granting the license renewal application and dismissing appellant's Petition to Deny renewal.

## I. BACKGROUND

Appellant Columbus Broadcasting Coalition (hereafter "the Coalition") is composed of individuals residing in the Columbus stations' broadcast area. The Coalition seeks, *inter alia,* to advance the interests of black residents of Columbus. The Coalition here challenges the granting of three separate license renewal applications,[3] timely filed by licensees on July 1, 1970. On August 31, 1970, the Coalition, pursuant to Commission rules, 47 C.F.R. § 1.580(i) (1970), filed a petition to deny the license renewal applications. The Coalition sought a hearing to examine licensees' ascertainment efforts, alleged monopolistic practices, employment practices, and programming performance.[4] After several extensions of time were granted to both sides and numerous oppositions and replies thereto had been filed,[5] the Commission agreed to consider the matter upon all submitted papers.[6]

On January 3, 1973, the Commission issued its Decision and Order, granting the license renewal applications and denying appellant's petition to deny the renewal. The Commission concluded, after a full consideration of all the pleadings, that the Coalition had raised no substantial or material issues of fact which established a *prima facie* case for denial, and thus no evidentiary hearing was required. Additionally, the Commission found that the grant of these renewal applications would serve the public interest, convenience and necessity.[7]

The Coalition now brings this appeal, asserting that it raised substantial and material issues of fact requiring a hearing, and the Commission erred in not granting such a hearing. In particular, appellant submits that substantial and material issues of fact exist as to the following matters:

(a) that renewal of the licenses would lead to excessive concentration in control of "mass media" in Columbus;

---

1. RadiOhio, Inc., 38 F.C.C.2d 721 (1973).

2. The stations are all owned and licensed by RadiOhio, Inc. and WBNS–TV, Inc., Columbus, Ohio, intervenors below and intervenor-appellees here (hereafter "licensees").

3. One each for the AM station, the FM station, and the TV station.

4. We do not elaborate on the Coalition's original Petition to Deny because appellant now alleges error in the denial of a hearing on certain discrete allegations. These will be fully discussed *infra.*

5. *See* 38 F.C.C.2d at 723.

6. This may have been a technical violation of the Commission's pleading rules. *See* 38 F.C.C.2d at 723. The Commission found that consideration of all the pleadings would prejudice neither side. *Id.* Neither party contests this ruling on appeal.

7. 38 F.C.C.2d at 749.

(b) that renewal of the FM license does not serve the public interest in that

1) WBNS–FM's past programming performance varied from its prior promised programming;

2) WBNS–FM's past programming did not meet the needs of the black community;

3) WBNS–FM's proposals for future programming are unsatisfactory;

(c) that the licensees discriminated in employment.

Additionally, appellant argues that the Commission failed to give its allegations a "hard look." [8]

## II. THE STANDARD OF REVIEW

■ Before discussing each of appellant's alleged errors, we must focus on section 309(d) of the Communications Act of 1934,[9] which governs Commission conduct in the area of broadcast license applications. In a thorough opinion which analyzed section 309(d), we said recently:

The legislative history accompanying the 1960 amendment of Section 309(d) indicates Congress' intent that petitions to deny filed under the amended Section 309(d) should make

a substantially stronger showing of greater probative value than is now necessary in the case of a post grant [of initial license] protest. The allegation of ultimate, conclusionary facts or more general allegations on information and belief, supported by general affidavits, as is now possible with protests, are not sufficient.

In the event, then, that a petition to deny does not make substantial and specific allegations of fact which, if true, would indicate that a grant of the application would be *prima facie* inconsistent with the public interest, the petition may be denied without hearing on the basis of a concise statement of the Commission's reasons

---

8. *See* Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

9. 47 U.S.C. § 309(d), as amended 1960, provides:

§ 309. Application for license.

\* \* \* \* \*

(d) Petition to deny application; time; contents; reply; findings.

(1) Any party in interest may file with the Commission a petition to deny any application (whether as originally filed or as amended) to which subsection (b) of this section applies at any time prior to the day of Commission grant thereof without hearing or the day of formal designation thereof for hearing; except that with respect to any classification of applications, the Commission from time to time by rule may specify a shorter period (no less than thirty days following the issuance of public notice by the Commission of the acceptance for filing of such application or of any substantial amendment thereof), which shorter period shall be reasonably related to the time when the applications would normally be reached for processing. The petitioner shall serve a copy of such petition on the applicant. The petition shall contain specific allegations of fact sufficient to show that the petitioner is a party in interest and that a grant of the application would be prima facie inconsistent with [the public interest]. Such allegations of fact shall, except for those of which official notice may be taken, be supported by affidavit of a person or persons with personal knowledge thereof. The applicant shall be given the opportunity to file a reply in which allegations of fact or denials thereof shall similarly be supported by affidavit.

(2) If the Commission finds on the basis of the application, the pleadings filed, or other matters which it may officially notice that there are no substantial and material questions of fact and that a grant of the application would be consistent with [the public interest], it shall make the grant, deny the petition, and issue a concise statement of the reasons for denying the petition, which statement shall dispose of all substantial issues raised by the petition. If a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent with subsection (a) of this section, it shall proceed as provided in subsection (e) of this section.

for denial. While this court in West Michigan Telecasters, Inc. v. FCC [130 U.S.App.D.C. 39, 396 F.2d 688] remanded a decision of the Commission in order that the FCC might either state with particularity the reasons for its grant of a broadcast application or hold a hearing, we recognized:

> Admittedly, the scope of our review is quite narrow; we defer to the expertise and experience of the Commission within its field of specialty and would reverse only where the Commission's position is arbitrary, capricious or unreasonable . . . [a]nd it is clear that the decision of when hearings are necessary or desirable to clarify issues is one which lies in the first instance with the Commission.

Stone v. FCC, 151 U.S.App.D.C. 145, 151, 466 F.2d 316, 322 (1972) (footnotes omitted). We also reiterate our words in *Stone,* that a hearing is not required to resolve undisputed facts.[10] Further, if the question is not of facts but of "inferences to be drawn from facts already known and the legal conclusions to be derived from these facts;"[11] no hearing is required. To summarize, the decision of whether or not hearings are necessary or desirable is a matter in which the Commission's discretion and expertise is paramount. We must examine the Commission's statement of reasons for denial, and if the Commission's action was not arbitrary, capricious or unreasonable, we must affirm.[12]

## III. APPELLANT'S SPECIFIC OBJECTIONS

### A. Concentration of Control

We now turn to the Coalition's specific allegations of error. The Coalition asserts that the Commission improperly refused to consider allegations of undue concentration of control of mass media in the Columbus area. Appellant points out that the licensees' principals own not only the three WBNS stations, but also the Dispatch Publishing Co., publishers of two daily newspapers and a Sunday newspaper in Columbus. The Commission has elected to deal with the problem of concentration of media control via rulemaking. In First Report and Order, Multiple Ownership of Standard, FM and TV Broadcast Stations,[13] 22 F.C.C.2d 306 (1970), the Commission held that ownership of more than one unlimited time broadcast facility in a single market was contrary to the public interest. Rules were promulgated to prohibit common ownership or control of both a television station and a radio station or both an AM and a FM station.[14] In order to prevent potentially disruptive divestitures under the new rules, the Commission "grandfathered" all existing multiple license holders. First Report and Order, *supra,* 22 F.C.C. 2d at 323. At the same time, the Commission initiated a further rulemaking to examine questions of divestiture by present multiple licensees and whether ownership of broadcast facilities by newspapers should be prohibited. Further Notice of Proposed Rule Making,

---

10. Stone v. FCC, 151 U.S.App.D.C. 145, 152, 466 F.2d 316, 323 (1972) ; *accord* Marsh v. FCC, 140 U.S.App.D.C. 384, 387–388, 436 F.2d 132, 135–136 (1970).

11. Anti-Defamation League of B'nai B'rith Pac. S.W.R.O. v. FCC, 131 U.S.App.D.C. 146, 148, 403 F.2d 169, 171 (1968), cert. denied, 394 U.S. 930, 89 S.Ct. 1190, 22 L. Ed.2d 459 (1969), *cited with approval,* Stone v. FCC, *supra* n. 10 at 323.

12. Stone v. FCC, *supra* n. 10 at 322, *quoting* West Michigan Telecasters, Inc. v. FCC,

130 U.S.App.D.C. 39, 41, 396 F.2d 688, 691 (1968) ; *see also* Southwestern Operating Co. v. FCC, 122 U.S.App.D.C. 137, 138, 351 F.2d 834, 835 (1965).

13. Commonly called the "one to a market proceedings."

14. *See* 22 F.C.C.2d at 307 ; 47 C.F.R. §§ 73.-35, 73.240 and 73.636 (1971). These rules had later amendments not pertinent here. *See* Multiple Ownership of Standard, FM and TV Broadcast Stations, 28 F.C.C.2d 662 (1971).

Multiple Ownership of Standard, FM and TV Broadcast Stations, 22 F.C.C.2d 339 (1970). During the pendency of this rulemaking the Commission has refused to consider questions of concentration of control unless specific abuses are shown. This court has approved the policy. Stone v. FCC, *supra* at 331; Hale v. FCC, 138 U.S.App.D.C. 125, 129, 425 F. 2d 556, 560 (1970).

The Coalition now submits that the Commission has abused its discretion because it has not been diligent in concluding the proposed rulemaking for over 4 years, and thus should no longer be allowed to refuse to consider concentration of control questions. In the alternative, the Coalition submits that they have pled facts sufficient to show specific abuses by licensees, thus entitling them, under *Stone* and *Hale,* to a hearing despite the pendency of the proposed rulemaking.

■ While four years might be characterized as an excessive period for a rulemaking, we realize that concentration of control is an extremely complex question. The Coalition does not allege bad faith or purposefully dilatory proceedings by the Commission. If we are to encourage the Commission to proceed by rulemaking for basic policy changes,[15] we must necessarily be patient. We are not, at this time, prepared to say that the Commission has acted improperly by not terminating the rulemaking proceeding and announcing its new rules before now. We, of course, encourage the Commission to act expeditiously in this rulemaking, and reserve the question of at what point a continuing failure to act could be the basis for a different conclusion. It is enough that for now we see no abuse. Further, the harshness of the general refusal to review concentration questions in licensing proceedings is mitigated to an extent by the exception, recognized in both *Hale* and *Stone,* that a hearing will be required if specific

abuse of multiple ownership can be alleged.

■ With respect to the Coalition's allegations of specific anticompetitive practices by the licensees, we think that the Commission was correct in deciding that appellant failed to raise substantial questions of abuse by the licensees' principals. The Coalition alleged that the *Dispatch* favored WBNS in its television listings. Further, it was alleged that the *Dispatch* had caused a competing TV channel's advertisements to be deleted in retribution for the competing channel's broadcast of a program critical of the *Dispatch.* Licensees in rebuttal submitted an affidavit of the executive editor of the *Dispatch* stating that the change in advertising format was made solely for journalistic reasons, and that his decision to change was made several weeks prior to the program critical of the *Dispatch.* We believe that the Commission acted properly when it ruled that the Coalition's allegations, without specific factual support were not sufficient to require a hearing.

The other major issue relating to abuse of media control by licensees concerns WBNS–TV's reaction to a program broadcast over WBNS in 1967 during which the Housing Director of the Urban League purportedly criticized licensees' principals for attempting to block the formation of a new minority owned bank. The Coalition alleged that, after broadcast, licensees attempted to force the Urban League to pay for the program, although it was normally carried on a sustaining basis. Further, the Coalition alleged that licensees forced the resignation of the Housing Director. Licensees submitted a statement from the Urban League that payment was never demanded. The Executive Director of the Urban League stated positively that the resignation of the Housing Director was not caused by any action on the part of the licensees. We again agree with the Commission that the Coa-

15. Stone v. FCC, *supra* n. 10 at 331; Hale v. FCC, 138 U.S.App.D.C. 125, 129, 425 F.2d 556, 560 (1970).

lition failed to submit specific facts which demonstrated an abuse by the licensees' principals of their joint ownership of the *Dispatch* and the various broadcast facilities.

## B. *Programming*

Next, the Coalition urges that the Commission erred by not granting a hearing on substantial and material issues concerning whether the grant of the renewal application would be *prima facie* inconsistent with the public interest. These issues center around WBNS–FM, and concern its programming, past and proposed.

As we have held in prior cases, a renewal applicant must literally "run on his record" in demonstrating that his past programming performance has been responsive to the needs of his broadcast area. Office of Communication of United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 341, 359 F.2d 994, 1007 (1966). However, there remains tension between allowing private broadcasting to develop with wide journalistic freedom, on the one hand, and the restriction on this freedom which inheres in the broadcaster's statutory duty to serve the public interest, on the other. *See* Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee, 412 U.S. 94, 110, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); Stone v. FCC, 151 U.S.App.D.C. 145, 157–158, 466 F.2d 316, 328–329 (1972). The licensee is accorded considerable discretion in programming choice, so long as it meets the needs of the community. *Columbia Broadcasting System, supra.* Petitioners to deny, such as the Coalition, must plead facts with specificity which will show that an existing licensee's programming has not met the needs of the community. *Stone, supra* at 329.

As to programming, the Coalition asserts, first, that sufficient evidence was produced to require a hearing on whether WBNS–FM's past programming performance varied substantially from its prior representations before the Commission.[16] This can, of course, be grounds for denial of a renewal application. FCC v. WOKO, Inc., 329 U.S. 223, 227, 67 S.Ct. 213, 91 L.Ed. 204 (1946); Brandywine-Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 473 F.2d 16 (1972), cert. denied, 412 U.S. 922, 93 S. Ct. 2731, 37 L.Ed.2d 149 (1973).

The Coalition admits that it did not raise the "promise versus performance" question in those terms before the Commission (Appellant's Br. at 20). A thorough reading of the record and Commission opinion indicates that the Commission did not consider the issue as being before it. The Commission stated clearly: "In the absence of substantial variations, no questions of promise versus performance will arise. There is no such question in this proceeding." 38 F.C.C.2d at 743. The Communications Act is clear that "a petition for rehearing shall not be a condition precedent to judicial review . . . except where the party seeking such review . . . (2) relies on questions of fact or law upon which the Commission . . . has been offered no opportunity to pass." 47 U.S.C. § 405 (1970). In construing section 405, this court has understood the phrase "opportunity to pass" as meaning that those who would seek judicial review must present the issue to the Commission for its consideration.[17] Hansen v. FCC, 134 U.S.App.D.C.

---

16. The representations are contained in their 1967 license renewal application.

17. Appellant, while admitting that it did not raise the issue with the Commission (Appellant Br. at 20), contends that the test is not whether an issue was raised by the individual seeking review, but "whether the Commission had in fact had the opportunity to pass upon the particular question of law or fact."

(*Id.*) The cases cited in the text do not support this proposition. Appellant relies upon a Sixth Circuit decision, Buckeye Cablevision, Inc. v. United States, 438 F.2d 948 (6th Cir. 1971). A close reading of that case, however, discloses that the rationale for not applying section 405 as a bar to review was clearly articulated. "The Commission has had an opportunity to consider the identical issues in this case but which *were*

100, 102, 413 F.2d 374, 376 (1969); *accord* Neckritz v. FCC, 446 F.2d 501 (9th Cir. 1971). Since the issue of promise versus performance was never presented to the Commission for decision, we are precluded from review.

With regard to WBNS–FM's past performance, appellant asserts, second, that past programming did not meet the needs and interest of the substantial black population in its broadcast area. Appellant here submits that a hearing should have been held concerning either of two specific criticisms of licensees' past FM performance. We shall denominate them, for purposes of brevity, as public affairs and black music format.

 As to public affairs, the Commission found on record evidence that while WBNS–FM relied primarily upon news and public service announcements to meet community needs, it did rebroadcast public affairs programs which originated on the AM station. These rebroadcasts occurred at different times than the AM broadcasts, thus increasing audience size. The Commission found that 1.67% of the FM station's time was devoted to public affairs programming. The evidence presented by licensees, summarized above, was entirely unrebutted by appellant who simply asserted its subjective characterization of licensees' performance as unsatisfactory. Programming is a matter left largely in the discretion of the licensee and can never be measured by a simple percentage test. Stone v. FCC, *supra* at 328. Furthermore, public affairs broadcasts cannot be broken down into "black points of view" versus "other points of view." *See, e.g.*, Evening Star Broadcasting Co., 27 F.C.C.2d 316, 322 (1971), aff'd sub nom., Stone v. FCC, *supra*. We therefore find that the Commission was correct in its judgment that the past programming of WBNS–FM was ade-

quate and reasonable, and that appellant's allegations did not raise factual issues sufficient to warrant a hearing.

 In assessing the validity of appellant's asserted error in the area of black music format, the result is the same. Appellant alleges only that it conducted an informal survey which disclosed that some of those surveyed felt more black performers ought to be played on the FM station. It is undisputed that the station's actual broadcast was not monitored nor was the survey ever submitted to the Commission. Licensees submitted a chart to the Commission which demonstrated that black artists were not excluded from the station's format. The Commission found, and we agree, that on the evidence submitted appellant did not sustain its allegation of discrimination against black performers.[18] Further, we point out, as did the Commission,[19] that normally ascertainment and programming are evaluated on the basis of community affairs programming, not music format. This is the case because each broadcast area will presumably have several radio stations, each of which will have its own specialized entertainment format. Of necessity, each station's format will not suit the taste of every individual or group. Hence, problems shared by the community provide the current standard by which to review past performance. *Cf.* Stone v. FCC, *supra* at 328 n. 44.

 Appellant next asserts that a hearing should have been held on the issue of whether WBNS–FM's proposed future programming will serve the public interest. WBNS–FM proposed to devote the following minimum amount of time to non-entertainment programming categories: 6.0% news; 1.5% public affairs; 2.0% all other. Appellant alleges that since the 1967 proposed figures were 7.5% news; 2.5% public affairs

---

*raised by other parties* . . . and it was not necessary for Buckeye to raise them again before the Commission." 438 F.2d at 951. Thus *Buckeye Cablevision* does not stand for appellant's proposition that reviewable issues need not be raised.

18. 38 F.C.C.2d at 741.

19. *Id.*

and 0% all other, the reduction in proposed news and public affairs programming, without more, constituted a *prima facie* case for denial of renewal. The Commission disagreed, stating that "the mere citation of what is deemed to be an insufficient amount of programming in these categories, without any evidence to support the assertion that such performance will fail to serve the public interest, is insufficient to raise a substantial and material question of fact as to whether a station will serve the public interest." 38 F.C.C. 2d at 743.

We believe the Commission was correct. As we said in the context of an assignment application in Hartford Communications Committee v. FCC, 151 U.S.App.D.C. 354, 467 F.2d 408 (1972):

> The program schedule, time or percentage of a licensee need not be identical with those of the previous licensee. *The test for dimunition of service is not mathematical equality, but the public interest.*

467 F.2d at 414 (emphasis added). We find the reasoning applicable here. Because the test is public interest, an assertion that proposed percentages differ from those proposed in the last licensing proceeding does not raise substantial factual questions. This is in line with established Commission policy. *See, e.g.,* Mahoning Valley Broadcasting Corp., 39 F.C.C. 2d 52, 61 (1972). Licensees here represented to the Commission that they intended to program in the future as they did in the previous license period (J.A. at 142) and appellant offers no reason to disbelieve these representations. Clearly, a hearing was not required on this issue.

### C. Employment Discrimination

Equal employment opportunity in the broadcast industry has been a source of concern for the Commission [20] and this court [21] in recent years. In the proceeding before the Commission, appellant contended that licensees did not employ black persons in significant numbers when measured against the black population in the broadcast area. Appellant contended further that black employees actually hired were placed in low visibility, nonpolicy making positions which had little future potential. In support of this assertion, appellant mentioned the case of Mr. Roosevelt Carter who, it was alleged, left his job at the TV station because he had no hope of future advancement and because a white man with less experience was hired to fill a position superior to that held by Mr. Carter.

Licensees submitted evidence as to the actual numbers of black employees contending that the figures were in keeping with the black population generally. Further, licensees submitted evidence concerning their minority recruitment and training program which they call the "Broadcast Skills Bank." Finally, licensees disputed appellant's account of the facts surrounding Mr. Carter's departure from their employ.

The Commission initially noted that in order to challenge a licensee's action with regard to equal employment opportunity "a petitioner must demonstrate with some degree of specificity that the licensee's employment policies and practices contain barriers to equal employment opportunity or that the licensee has in fact discriminated against applicants and employees because of race, color, religion, national origin or sex." 38 F.C.C. 2d at 745–46. *See* Time-Life Broadcast, Inc., 33 F.C.C.2d 1050 (1972). The circumstances of this case do not require us to assess the legal correctness of the phrase "some degree of specifici-

20. *See* Nondiscrimination Employment Practices of Broadcast Licensees, 13 F.C.C.2d 766 (1968); Nondiscrimination Employment Practices of Broadcast Licensees, 18 F.C.C. 2d 240 (1969); Nondiscrimination Employment Practices of Broadcast Licensees, 23 F.C.C.2d 430 (1970).

21. *E.g.,* Stone v. FCC, *supra,* n. 10; Billingual Bicultural Coalition of Mass Med. Inc. v. FCC, 160 U.S.App.D.C. 390, 492 F.2d 656 (1974).

ty" because we are satisfied that appellant's allegations did not require the Commission to hold a hearing.

Turning first to the statistical data which appellant contends supports its claim, we note that it is Commission policy that fully proportional employment is not required by the Commission's rules. *See* Non Discrimination in Employment Practices of Broadcast Licensees, 23 F.C.C. 2d 430 (1970). The facts as found by the Commission are as follows. The 1970 Census reveals that 11.6% of the Columbus Standard Metropolitan Statistical area is black. 38 F.C.C.2d at 746. The employment figures reveal that at the time the pleadings were filed, the licensees' three stations employed 15 blacks in other than custodial positions, 8.3% of the total work force. *Id*. In 1971, the stations employed 18 blacks with a work force of 188, or 9.5%. During 1972, 17 blacks were employed out of a work force of 170, or 10%.[22]

■■ The Commission noted that "while an extremely low rate of minority hiring may raise questions" requiring a hearing, 38 F.C.C. 2d at 746, here "the composition of the WBNS stations' minority staff falls within a range of reasonableness when compared to the percentage of minorities in the stations' service areas." *Id*. The finding appears amply supported in the record and reasonable. In fact, in its brief to this court, appellant agrees, saying "the licensee's total percentage of black employees is significant in terms of the black population of the licensee's service area." Appellant's Br. at 62.

■■ Appellant, while choosing not to dispute the finding of the Commission as to the statistical evidence, now relies upon two principal arguments to show either a pattern or policy of unequal treatment or an individual instance of discrimination. First, appellant contends that there exists an erratic employment pattern which, without more, would require a hearing. While it is true that the number of black employees declined by one (18 to 17) between 1971 and 1972, the number of employees also declined (188 to 170). Appellant alleges that licensees have no active commitment to minority recruiting, hiring blacks solely to produce statistics which would please the Commission in this renewal proceeding. On this point appellant has offered no proof and apparently did not raise this argument with the Commission.

The evidence produced by the licensees concerning minority hiring, on the other hand, was impressive. The Broadcast Skills Bank is an organization formed by licensees and other Columbus area broadcasters to recruit, train and place workers in the broadcast industry. The head of the Skills Bank stated in an affidavit that the directors of the program were meeting regularly, establishing a training program, and screening 15 to 20 applicants per week. He indicated that the program was directly responsible for "literally doubling the employment of black people" in the Columbus broadcast industry.[23] The Commission concluded, and we agree, that the uncontested evidence showed that licensees had an active minority recruiting program which had resulted in blacks accounting for 20% of all licensees' new hires during the past license term. 38 F.C.C.2d at 746–47. Taken as a whole we think that appellant's argument of an erratic hiring policy is more than met by the strong evidence of a very positive, result producing, minority recruitment program.

Next, appellant points to Mr. Carter's voluntary termination as a specific instance of employment discrimination. The facts alleged by appellant were that Mr. Carter left his job because a white man was hired to fill a

---

22. 38 F.C.C.2d at 746. The sources of these figures were the 1971 and 1972 statistical profile reports (FCC Form 395) submitted annually by all broadcast licensees.

23. Affidavit of Mr. Charles White, J.A. Vol. I at 199–205.

job to which Mr. Carter aspired. To support the claim that Mr. Carter left because of unfair treatment it was contended that Mr. Carter took a lesser paying job outside the broadcast industry. These allegations were supported only by a letter by Mr. Carter addressed "to whom it may concern." J.A. vol. I at 91. Licensees submitted affidavits that stated that Mr. Carter left for reasons other than race. J.A. vol. I at 232, 236–38, 265–66. Licensees also submitted a letter from Mr. Carter's subsequent employer stating that his pay in his later job was $9,226.89 per annum, a figure more than $2,000.00 higher than he received at WBNS–TV. J.A. vol. I at 264. Finally, licensees submitted a letter which they received from Mr. Carter when he left their employ which praised the station for being "color blind" and concluded with an apparently sincere thank you. J.A. vol. I at 267.

On the basis of this evidence the Commission could have reasonably found explicitly that there was no racial discrimination whatsoever involved in the Carter incident. If the two unsworn, contradictory letters from Mr. Carter are viewed as raising a disputed question of fact, that question would be only as to Mr. Carter's state of mind, his perception of discrimination. As we have held, contradictory allegations "which create some possibly unresolved factual issue do not invariably necessitate an evidentiary hearing." Broadcast Enterprises, Inc. v. FCC, 129 U.S.App.D.C. 68, 70, 390 F.2d 483, 485 (1968). This is especially true where, as here, the factual issue created, even when considered in the light most favorable to appellant, i.e., that Mr. Carter felt he had been denied equal opportunity, is amply rebutted by contradictory evidence. See Stone v. FCC, supra, at 323 n. 18 and accompanying text. We are satisfied that the Commission did not commit error in holding that appellant's allegations did not require an evidentiary hearing on the issue of racial discrimination in employment, either as concerns policy or as concerns Mr. Carter's particular situation.

## D. Failure to Give a "Hard Look"

Finally, appellant alleges that the Commission failed to give their case a "hard look." See e.g., Greater Boston Television Corp. v. FCC, 143 U.S.App. D.C. 383, 444 F.2d 841 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L. Ed.2d 701 (1971). We understand this allegation to be nothing more than a recapitulation of the same asserted Commission errors which we have treated at length above. Since we find that appellant did not produce specific facts which would raise material and substantial issues of fact sufficient to make a prima facie showing that license renewal would contravene the public interest, the Commission acted reasonably in granting the license renewals without hearing. The order of the Commission is, therefore,

Affirmed.

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

## ORDER

PER CURIAM.

Appellant's suggestion of in banc consideration having been transmitted to the full Court and no Judge thereof having called for a vote with respect thereto, it is

Ordered by the Court en banc that appellant's aforesaid suggestion of in banc consideration is denied.

Statement of Chief Judge BAZELON, concurred in by Circuit Judges J. SKELLY WRIGHT, McGOWAN, TAMM and WILKEY.

I would vote to deny rehearing en banc on the basis of Judge Tamm's concurring opinion in Hale v. FCC, 138 U.S. App.D.C. 125, 425 F.2d 556, 560 (1970). However, like Judge Tamm, I expect the Commission to issue its cross-ownership policy within the year; if it does not, I am presently of the view that this Court must eventually rule on its de facto policy followed in Hale and this case.