**WASHINGTON ASSOCIATION FOR TELEVISION AND CHILDREN, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION,**

**Taft Broadcasting Company, Intervenor.**

**WASHINGTON ASSOCIATION FOR TELEVISION AND CHILDREN, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION,**

**Taft Broadcasting Company, Intervenor.**

**Nos. 79–2223, 79–2224.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 2, 1981.

Decided Sept. 11, 1981.

---

Wilhelmina Reuben Cooke, Washington, D. C., with whom Nolan A. Bowie, Washington, D. C., and Jeffrey H. Olson, New Ulm, Minn., were on the brief, for appellant.

C. Grey Pash, Jr., Counsel, F. C. C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Washington, D. C., were on the brief, for appellee.

Arthur B. Goodkind, Washington, D. C., with whom Bernard Koteen and Margot Smiley Humphrey, Washington, D. C., were on the brief, for intervenor.

Before MIKVA and EDWARDS, Circuit Judges, and VAN PELT *, United States Senior District Judge for the District of Nebraska.

Opinion for the Court filed by Circuit Judge MIKVA.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

MIKVA, Circuit Judge:

The Federal Communications Commission (FCC) approved the transfer of control of Channel 20 in Washington, D.C., to the intervenor in this case, Taft Broadcasting Company (Taft). The appellant, Washington Association for Television and Children (WATCH), raises a variety of procedural and substantive objections to the manner in which the FCC performed. We hold that a number of these objections have become moot because of an intervening change in FCC policy with regard to the concentration of market power in the television broadcasting industry, and that the rest are without merit. We affirm the orders of the Commission.

## I. BACKGROUND

On July 25, 1978, Taft, after having negotiated a transfer of control of Channel 20 from Improvement Leasing Company (Improvement), filed an application to secure FCC approval. On August 17, 1978, the Commission issued a public notice that the application had been accepted for filing. This notice triggered the thirty-day period during which interested parties may file petitions asking the FCC to deny the application for transfer. See 47 C.F.R. § 73.-3584(a) (1980). WATCH did not file its petition to deny Taft's application until March 19, 1979, seven months after the notice.

On April 3, 1979, Taft moved to dismiss WATCH's petition as untimely filed. This motion was followed by a number of other pleadings from both WATCH and Taft. The FCC refused to accord WATCH the full party status it had sought in tendering its petition to deny, see 47 U.S.C. § 309(d) (1976), but it decided to treat WATCH's contentions as "informal objections" under 47 C.F.R. § 73.3587 (1980) when it met to consider Taft's application on August 1, 1979. The meeting, attended by six of the seven Commissioners, resulted in a tie vote and Taft's application was not approved. The Commission did vote, however, to allow Taft to amend its application for reconsideration at a later date.

Taft responded on the next day with an amendment to its programming proposals. The amendment sought to strengthen the case for an exemption from the FCC's "Top 50 Policy." This policy had been adopted by the FCC as a means to prevent a single entity from controlling a large number of television stations. The policy precluded a licensee from acquiring a fourth television station, either VHF or UHF, or a third VHF station, in the fifty largest television markets unless it could make a "compelling public interest showing"[1] to justify a waiver. On August 2, the FCC met, decided to consider the amended application on August 10, and gave WATCH until August 8 to file comments.

Public notice of the upcoming August 10 meeting was given on August 6 and again on August 8. WATCH objected to the short notice and sought a temporary restraining order in the district court to prevent the August 10 meeting from taking place. It alleged that the August 2 meeting, as well as the notices of the August 10 meeting, were deficient under the Sunshine Act, 5 U.S.C. § 552b(e)(1) (1976), and the Commission's own regulations, 47 C.F.R. § 0.605(e) (1980). The FCC responded by issuing a notice on August 9 that the meeting to consider Taft's amended application would be held a full seven days later, on August 16. Consequently, WATCH withdrew its suit for a temporary restraining order.

At the August 16 meeting Taft's application was approved by a vote of four to three. The Commission rejected all of WATCH's objections and found both that a waiver of the Top 50 Policy was justified[2] and that granting the application for transfer of control of Channel 20 would serve the "public interest, convenience, and necessity," as required by 47 U.S.C. § 309(a) (1976).

Because their contract had a termination date of August 17, 1979, Taft and Improvement immediately proceeded to consummate the transfer.[3]

WATCH then moved the FCC to order the transfer rescinded because it could not legally take place before a written order had issued. Five days later, WATCH sought relief in this court through a mandamus proceeding. The court deferred action on WATCH's petition until the Commission had an opportunity to act on the motion to rescind. On September 14, the FCC released an order denying the motion and holding that the transfer had not taken place illegally, *Improvement Leasing Co.*, 73 F.C.C.2d 676 (1979) ("*Premature Transfer Order*"); and on September 28 it released the order approving the transfer that it had adopted at its August 16 meeting, *Improvement Leasing Co.*, 73 F.C.C.2d 655 (1979) ("*Initial Transfer Order*"). Then this court dismissed WATCH's petition for mandamus as moot because the FCC's written order had issued. *See In Re Washington Association for Television and Children*, No. 79–1992 (D.C.Cir. Oct. 31, 1979).

WATCH appealed, pursuant to 47 U.S.C. § 402(b)(6) (1976), from both the *Initial Transfer Order* and the *Premature Transfer Order*. It seeks reversal based on the allegations made in its petition to deny Taft's application, in its supplemental pleadings and communications with the Commission prior to the approval of the application, and in its attempts to have the transfer of the license rescinded.

## II. DISCUSSION

### A. *Top 50 Policy*

Prior to its acquisition of Channel 20, Taft already owned five VHF stations and

---

1. *Multiple Ownership of TV Broadcast Stations*, 22 F.C.C.2d 696, 700 (1978).

2. Three Commissioners dissented on this point; they maintained that Taft had not made the requisite showing of "compelling public interest." *See Improvement Leasing Co.*, 73 F.C.C.2d 655, 670 (1979) ("*Initial Transfer Order*") (dissenting statement of Chairman Ferris &

Commissioner Fogarty); *id.* at 675 (dissenting statement of Commissioner Brown).

3. WATCH sought to prevent the transfer by a motion for a stay of the August 16 decision. Taft and Improvement went ahead with the transfer, however, and the FCC denied the motion on August 17.

one UHF station in the top fifty television markets.[4] In order for it to obtain an exemption from the Top 50 Policy, Taft had to make a "compelling public interest" showing of "the benefits in detail that are relied upon to overcome the detriment with respect to the policy of diversifying the sources of mass media communications to the public." *Multiple Ownership of TV Broadcast Stations*, 22 F.C.C.2d 696, 700 (1968).

At its August 16 meeting, the Commission found that Taft had made such a showing. *See Initial Transfer Order*, 73 F.C.C.2d at 656–64. WATCH continues to object strenuously to that finding, and the three dissenting Commissioners objected as well, *see* note 2 *supra*. It is clear that the adequacy of Taft's case for an exemption from the Top 50 Policy is the central substantive issue on this appeal. Were it not equally clear that the issue is moot, we should have to determine whether the Commission's approval of the application was unreasonable, and whether any "substantial and material question[s] of fact" existed so as to require a formal hearing pursuant to 47 U.S.C. § 309(e) (1976).

■ Before the proceedings with respect to Taft's transfer application began, the FCC had announced its intention to reconsider the Top 50 Policy. *See Multiple Ownership—Television B/C Stations*, 68 F.C.C.2d 837 (1978). Subsequently it decided to repeal the policy. *Top 50 Ownership Policy*, 75 F.C.C.2d 585 (1979), *reconsideration denied*, 82 F.C.C.2d 329 (1980), *appeal pending sub nom. NAACP v. FCC*, No. 2416 (D.C. Cir. Nov. 20, 1980). Given this develop-

ment, we are led to conclude that it would be "an idle and useless formality," *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766–67 n.6, 89 S.Ct. 1426, 1430 n.6, 22 L.Ed.2d 709 (1969), to remand this case to the Commission if we were to find that it had not applied its Top 50 Policy properly. The reason is simple: there is no more Top 50 Policy to apply. No matter how many errors the Commission may have committed in applying the policy this time around, on remand, other things being equal, it would merely approve once again an otherwise acceptable application. It would not correct its mistakes because it would not have to do so; it would not have to pay any further attention to the Top 50 Policy at all.

■ We believe that a finding of mootness is the only proper one here. The Commission, in an intervening proceeding, has determined that the policy previously applied in cases like this one no longer serves the public interest, convenience, and necessity, and therefore will not be applied henceforth. We hold that in such circumstances an agency cannot be required to apply a policy it has rejected.[5] Such a requirement would amount to a command to the agency to disregard its statutory mandate: it would have to employ a policy that, by its own determination, did not serve the public interest.[6] That the FCC's repeal of its policy currently is being appealed before this court does not disturb our conclusion. To hold that a repealed policy must be applied pending judicial review would tie an agency's hands for the

---

4. Taft had owned the five VHF stations prior to the adoption of the Top 50 Policy; the policy had been waived for its acquisition of the sixth station, *see WIBF Broadcasting Co.*, 17 F.C.C.2d 876 (1969).

5. A different result might well be suggested if we could accept WATCH's intimation that the repeal of the Top 50 Policy was motivated solely by litigation strategy on the part of the FCC. The facts of this case warrant no such conclusion. Reconsideration of the Top 50 Policy was well under way before WATCH challenged Taft's application. While a consequence of our holding may indeed be to "evis-

cerate through rulemaking the substantive grounds for appeal," Reply Brief of Appellant at 21, we cannot say that the Commission repealed the Top 50 Policy in order to achieve that result.

6. Furthermore, applying the Top 50 Policy on remand in this case, while not applying it in similar cases that arise after the repeal of the policy, could well engender inconsistent results with regard to similarly situated applicants. This inconsistency would contravene the cardinal principle that like cases should be decided alike.

frequently long periods during which appeals await disposition in the courts.[7]

## B. *Misrepresentations*

In its application for transfer of the Channel 20 license, Taft made a number of somewhat equivocal statements that perhaps could be read to suggest that it was relying in part on the ailing financial status of the station to justify a waiver of the Top 50 Policy.[8] That in any event is the way in which WATCH has read the application. Proceeding from that interpretation, it maintains that Taft attempted to deceive the Commission, or at the very least did not conform to the applicable regulations,[9] by not amending its application to indicate that Channel 20 had begun to show a profit from June 1978 on.

In a statement filed with the Commission on May 17, 1979, *see* Joint Appendix (J.A.) 202, Taft disclaimed any intention to rely on the imminent financial failure of Channel 20 under the current licensee. It asserted instead that it had merely described the station as "marginal." This term, according to Taft, meant that Channel 20 was in a weak competitive position typical of independent UHF stations, and could be strengthened by an infusion of broadcasting expertise and financial resources. The station's profitability since mid-1978, Taft claimed, did not affect the characterization of it as marginal. Short swings between periods of profit and loss had occurred before, and the latest oscillation did not alter the picture of financial volatility that Taft had presented with respect to Channel 20. The Commission accepted this explanation of why Taft had not supplied additional information about Channel 20's performance. *Initial Transfer Order*, 73 F.C.C.2d at 664.

The issue here is not whether the Commission's decision to approve Taft's application was based on inaccurate or incomplete information about the financial status of Channel 20. As we have indicated, the correct application of the Top 50 Policy is now moot. The relevant inquiry is whether this case involves any "false statements, misrepresentation or lack of candor"[10] that

---

7. The logic that demands continued application of defunct policies before the *first* stage of appellate review is completed also would seem to require the agency to await action by the Supreme Court. An agency could be prevented for years from implementing its policy judgments.

8. *See* Taft Application, Exhibit No. I–1, Joint Appendix (J.A.) 38–40, 42, 52–55. The chief factors that, "in varying degrees and either by themselves or in combination," *Initial Transfer Order*, 73 F.C.C.2d at 657, have in the past been considered sufficient to justify an exception to the Top 50 Policy, are:

—The sale would increase diversity of media by breaking up "grandfathered" combinations not in compliance with the multiple ownership rules.
—The sale would revitalize a financially ailing station.
—The sale would allow the resumption of construction of a community's first UHF station.
—The sale would preserve the vitality of a UHF group by preserving experienced management, sales personnel, and syndicated programming. . . .
—The buyer's stations are not geographically concentrated.
—The buyer's stations do not dominate their respective markets.

—The buyer will improve public affairs programming.
—The buyer's increase in potential households is minimal.
—The buyer faces substantial competition in each market.
—The acquisition will not improve the buyer's competitive position.
—The sale will diversify commonly owned television and nonbroadcast media.
*Multiple Ownership—Television B/C Stations*, 68 F.C.C.2d at 840 (citations and footnotes omitted).

9. The relevant regulation reads:
Whenever there has been a substantial change as to any . . . matter which may be of decisional significance in a Commission proceeding involving a pending application, the applicant shall as promptly as possible . . . unless good cause is shown, submit a statement furnishing such additional or corrected information as may be appropriate . . . .
47 C.F.R. § 1.65 (1980).

10. *Radio Carrolton*, 52 F.C.C.2d 1173, 1182 (1975), *rev'd on other grounds sub nom. Faulkner Radio, Inc. v. FCC*, 557 F.2d 886 (D.C.Cir. 1977).

would raise serious doubts about whether Taft's character justified a grant of a license under the public interest standard of 47 U.S.C. § 309(e) (1976).

■ The Communications Act requires the Commission to hold hearings in license proceedings "if a substantial and material question of fact is presented." 47 U.S.C. § 309(e) (1976). In applying the statute, we proceed from the principle that "[a] hearing is not required when facts are undisputed or when the case turns on only the 'inferences to be drawn from facts already known and the legal conclusions to be derived from these facts.'" *Alianza Federal de Mercedes v. FCC,* 539 F.2d 732, 736 (D.C. Cir.1976) (quoting *Columbus Broadcasting Coalition v. FCC,* 505 F.2d 320, 324 (D.C.Cir. 1974)). We conclude, first, that no hearing was required on the misrepresentation issue. There were no significant factual issues in dispute; it was clear that Taft had not updated its application, and the question involved the legal inferences to be derived from that fact in the context of the transfer proceedings. There was nothing to be gained from holding formal hearings on this issue. The Commission was capable of applying its expertise on the basis of the record before it, including Taft's explanation for not having considered it necessary to supplement its application with more financial data.[11]

■ After determining that no hearing was necessary, the Commission concluded that Taft's explanation was reasonable. *Initial Transfer Order,* 73 F.C.C.2d at 665. The standard applied by the Commission in cases involving possible misrepresentations on the part of applicants for licenses is one

of intent. *See, e.g., Bluegrass Broadcasting Co.,* 43 F.C.C.2d 990, 992 (1973). It can be argued that the better course for Taft would have been to apprise the FCC of *all* developments with regard to Channel 20, irrespective of whether Taft itself considered them significant. We cannot say, however, that the record demands the conclusion that Taft's failure to do so sinks to the level of an intentional effort to deceive the Commission. To the contrary, the FCC's conclusion that it should not be so regarded is based on the record before it, namely, the explanation offered by Taft.[12] The Commission's action cannot be termed arbitrary and capricious, and we uphold it.

## C. *Party Status*

### 1. *Untimeliness of WATCH's Petition to Deny*

■ WATCH contends that it should have been accorded the status of a full party[13] to the transfer proceedings. Even though its petition to deny concededly was filed long after the expiration of the thirty-day period during which such petitions are accepted as timely, WATCH asserts that it lacked actual notice of the filing of Taft's application and that the thirty-day period therefore should have been tolled. This lack of notice is traced to the "understanding" of WATCH's president, from an interview with a Taft employee, that Taft would not file its transfer petition prior to December 1978 or January 1979.[14]

The FCC declined to accept WATCH's petition to deny Taft's application; it termed the petition "procedurally defective in that it does not meet the requirements

11. In so deciding we are mindful of the conclusion of this court that "Congress intended to vest in the FCC a large discretion to avoid time-consuming hearings whenever possible." *Southwestern Operating Co. v. FCC,* 351 F.2d 834, 835 (D.C.Cir.1965).

12. The Commission's finding that Taft's explanation was reasonable on its face amounts to a determination that, in the context of the transfer application, it also was credible. Thus, the Commission found in effect that there was no substantial issue of Taft's credibility involved here, and that a hearing was not warranted on

that score. We agree that when the issue is viewed from this perspective, there is no necessity for a hearing.

13. The chief advantage WATCH would have derived from party status would have been full participation in any hearings the Commission might have held. *See* 47 U.S.C. § 309(e) (1976).

14. *See* Affidavit of Nancy Forbord (President of WATCH), J.A. 151.

with respect to timeliness," *Initial Transfer Order*, 73 F.C.C.2d at 657.[15] We agree with that conclusion insofar as it relates to the long period between the public notice of Taft's application on August 17, 1978 and WATCH's petition of March 19, 1979. WATCH, as an organization represented by counsel intimately familiar with the notice procedures employed by the FCC, cannot be heard to say that its failure to learn of the application was justified.[16] In addition, we note that WATCH indicated that it first learned of the application in mid-February of 1979, *see* Affidavit of Nancy Forbord (President of WATCH), J.A. 151, 152. Why it then waited more than thirty days before filing its petition is unexplained and perhaps inexplicable.

### 2. *Major Amendment*

■ We are of a different opinion with regard to the timeliness of WATCH's petition at a later stage of the proceedings. On August 2, 1979, with the FCC's permission, Taft submitted an amendment to its original application. This amendment augmented Taft's proposed programming changes for Channel 20. It was designed to improve the applicant's public interest showing as a justification for a waiver of the Top 50 Policy. Because the only different informa-

tion before the Commission at its August 16 meeting was this amendment, WATCH contends[17] that the amendment swung the vote from a 3–3 tie to 4–3 in favor of Taft. Consequently, WATCH argues, it was by definition a major amendment triggering a new thirty-day filing period for petitions to deny. *See* 47 U.S.C. § 309(b), (c) (1976).

■ We agree. The statute gives the Commission the authority to "adopt reasonable classifications of applications and amendments," 47 U.S.C. § 309(g) (1976). The regulations in which it has done so classify changes in programming plans as major amendments with regard to applications for license renewals, *see* 47 C.F.R. § 73.3578(a) (1980), but not with regard to applications for transfer of control, *see id.* § 73.3578(b). We hold that whatever the merits of this distinction in the typical case, it was not "reasonable" in this case to style Taft's amendment as minor. Its obvious decisional significance renders such a possibility inconceivable.[18] If we saw any real sense in doing so, therefore, we would remand Taft's application to the Commission and order it to grant WATCH full party status. The mootness of the Top 50 Policy issue, however, together with our finding that no other issues would require a hear-

---

15. We reject WATCH's contention that the FCC, even if its decision to refuse to accept the petition was correct, nevertheless should have provided a more complete statement of its reasons. Particularly in view of this court's conclusion that "[a]n applicant for waiver faces a high hurdle even at the starting gate," *WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C.Cir. 1969), we find it sufficient that the FCC stated its reason for its action—the untimeliness of the WATCH petition. It did not have to undertake a detailed refutation of WATCH's proffered justifications for a waiver of the thirty-day rule. This is not, we hasten to add, the same as saying that an agency, when presented with reasons why a waiver should be granted, may simply *ignore* them and apply a rule woodenly.

16. This conclusion might well stand even if we could conclude from the record that Taft clearly misinformed WATCH about its intentions. *Cf. 220 Television, Inc.*, 48 P&F Rad.Reg.2d 537 (Oct. 14, 1980) (FCC refused to waive filing period even though petitioner had alleged it had been misled about cutoff date by FCC staff

member). The record warrants no such conclusion, however.

17. The dissenting Commissioners made the same claim, *see Initial Transfer Order*, 63 F.C. C.2d at 672–73.

18. Nor are we persuaded to conclude otherwise by the statement of Commissioner Lee (who was absent from the August 1 meeting but participated in the August 16 meeting by means of a transatlantic conference hookup from West Germany) that he would have approved the application on August 1 without the amendment. *See Initial Transfer Order*, 73 F.C.C.2d at 673 (Separate Statement of Commissioner Lee). Had Commissioner Lee been present on August 1, it is at least possible that he would have been won over by his three colleagues who voted down Taft's application. By the same token, the three who voted *for* Taft on August 1 might have been convinced to change their minds by August 16 if Taft had not offered its amendment.

ing,[19] indicates that a remand would afford WATCH no meaningful relief.[20]

### D. *Sunshine Act*

WATCH alleges that notices of the Commission's August 2 meeting—the meeting at which it did no more than set a date to consider Taft's amended application—were inadequate in terms of the Sunshine Act and the agency's regulations.[21] We are unable to conclude that the FCC's action should be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706 (1976). We do, however, find fault with the regulations under which the Commission was operating.

■ The Sunshine Act exempts from its definition of "meeting," 5 U.S.C. § 552b(a)(2) (1976), deliberations required or permitted by *id.* § 552b(e). That subsection deals with a seven-day notice requirement and refers to deliberations about whether to schedule future meetings with shorter notice. We conclude from this that the August 2 meeting was not embraced by the statutory definition. As a result, it was not subject to the *statutory* notice provisions.

The FCC's regulations implementing the statute are stricter than the statute demands. The Commission's own definition of "meeting" does not contain an exception regarding deliberations about short notice like that found in § 552b(a)(2) of the statute. Apart from one exception that is not relevant here, it includes deliberations that "result in the joint conduct of [sic] disposition of official agency business." 47 C.F.R.

§ 0.601 (1980). And the following provision regarding short notice, again stricter than the statutory requirement,[22] applies to FCC practice:

If the prompt and orderly conduct of agency business requires that a meeting be held less than one week after the announcement of the meeting, or before that announcement, the agency will issue the announcement at the earliest practicable time. In addition to other information, the announcement will contain the vote of each member of the agency who participated in the decision to give less than seven days' notice and will specify the nature of the emergency situation if it is not clear from the subject matter.

47 C.F.R. § 0.605(e) (1980).

The record shows that whether the August 2 meeting was noticed promptly enough, and whether there really was an "emergency" situation, are questions that certainly are open to debate. We decline to enter the debate, however, for we conclude that a precondition for it is lacking. The agency's definition of a meeting at 47 C.F.R. § 0.601 is impermissibly broad; like the statute it is supposed to track, it should not include meetings such as the one that took place on August 2.

■ The Commission's regulation requires it to give seven days' notice of meetings whose only order of business is to decide whether to call a future meeting with shorter notice. The statute itself, of course, demands no such absurd, wasteful result. The regulation increases the agen-

---

19. WATCH also contends that a hearing should have been held on the question of whether the proceedings were tainted because an FCC attorney with some involvement in the case was a relative of the Taft family. This contention is without merit and was disposed of adequately by the Commission, *see Initial Transfer Order*, F.C.C.2d at 669.

20. We note in this regard that granting a petitioner party status under 47 U.S.C. § 309(d) (1976) does not require that hearings be held. The statute merely allows a party to participate in hearings *if*, pursuant to § 309(e), they are necessary because a substantial and material question of fact is presented.

21. Originally WATCH had also objected to the Commission, and sought relief in the district court, with regard to the notices of the meeting at which Taft's amended application would be considered. By then scheduling this meeting for August 16 and issuing notice of it seven days earlier, the FCC mooted these objections, and they are not now before us.

22. The statute, 5 U.S.C. § 552b(e)(2) (1976), does not require a specification of the nature of an "emergency situation."

cy's administrative burden significantly with no conceivable corresponding public benefits. Indeed, we are unable to discern any reason for the breadth of the agency's definition of "meeting"—apart from shoddy draftsmanship, perhaps. While we recognize that an agency generally is free to shoulder burdens more onerous than those specifically imposed by statute, the regulation at issue here is in excess of the Commission's rulemaking discretion under 47 U.S.C. § 154(i) (1976). Consequently, we set it aside to the extent that its definition of "meeting" is more inclusive than the one contained in the Sunshine Act.[23]

### E. *Prematurity*

Finally, WATCH maintains that it was improper for Improvement and Taft to consummate the transfer of Channel 20 immediately after the Commission's meeting on August 16, 1979. Instead, WATCH argues, they should have awaited the issuance of a written order approving the transfer and denying the petition to deny pursuant to 47 U.S.C. § 309(d)(2) (1976). This issue is now moot with regard to the transfer of Channel 20.[24] The Commission's written order has in fact issued, *see Initial Transfer Order*, 73 F.C.C.2d 655 (released Sept. .28, 1979); an order to rescind the transfer to await a written order, while it would have

been possible between August 16 and September 28, is now an impossibility.[25]

A further point concerning prematurity should be mentioned. The statute requires that once a "substantial" amendment to an application has been filed, a period of at least thirty days must be allowed for the filing of petitions to deny. 47 U.S.C. § 309(d)(1) (1976). WATCH's petition was already before the Commission, but our holding that the August 2 amendment was major requires the conclusion that others should have had until September 2 to file petitions to deny. The FCC should not have taken action with regard to the application at its August 16 meeting.[26] Once again, however, the issue is mooted by the repeal of the Top 50 Policy. There is no point now in vacating the transfer and requiring a thirty-day period for possible further comment on an amendment that is no longer of any relevance to the Commission's decision.

### III. CONCLUSION

The FCC has by no means served as an exemplar of proper agency procedure in this case. Were the issues related to the Top 50 Policy and the effective date of agency action not moot, we would remand the proceedings to the Commission and require it to accord WATCH full party status,

**23.** We pause to note, for the sake of clarity, that we are not questioning the propriety of requiring the specification of an emergency situation as justification for calling meetings on short notice. It must be remarked, however, that 47 C.F.R. § 0.605(e) (1980) contains an apparent inconsistency: it begins with a calm reference to the prompt and orderly conduct of agency business as grounds for calling meetings on less than a week's notice, but ends with talk of emergencies.

**24.** In addition, we see no point in delving into WATCH's attacks on the propriety of the FCC's allowing parties to consummate transfers at their own risk pending the issuance of written orders, *see Premature Transfer Order*, 73 F.C.C.2d 676 (1979). We are unconvinced that the statute requires a written order before FCC action becomes effective, and in any event the issue of the effective dates of orders has now been clarified. The FCC has recently adopted regulations providing that absent a specific statement to the contrary by the Com-

mission, the effective date of an order is the date on which public notice of the action is provided. *See* FCC Docket No. 80–488 (March 10, 1981) (to be codified at 47 C.F.R. §§ 1.4(b), 1.103).

**25.** That this impossibility arose on September 28 explains why this court then dismissed WATCH's petition for mandamus as moot, *see In Re Washington Association for Television and Children*, No. 79–1992 (D.C.Cir. Oct. 31, 1979).

**26.** The FCC pointed out that, except for WATCH, no one had ever shown interest in objecting to Taft's application. See *Initial Transfer Order*, 23 F.C.C.2d at 668. This is of course irrelevant to our decision. The Commission was obligated to wait the required thirty days before acting on the amended application, regardless of its prediction of the level of public interest in the proceedings.

as well as to wait thirty days before acting on Taft's amended application. We would also be required to determine, on this appeal, whether the Commission's finding of adequate justification for a waiver of the Top 50 Policy was warranted. However, our finding of mootness strips such action of all practical purpose. The orders appealed from are

*Affirmed.*