**BLACK BROADCASTING COALITION OF RICHMOND, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**Roy H. Park Broadcasting of Virginia, Inc., Intervenor.**

**No. 75–1885.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 13, 1976.

Decided April 20, 1977.

Rehearing Denied June 17, 1977.

As Amended on Denial of Rehearing July 20, 1977.

Nolan A. Bowie, Washington, D.C., with whom Frank W. Lloyd, III, Washington, D.C., and Henry L. Marsh, III and William H. Bass, III, Richmond, Va., were on the brief, for appellant.

J. Tullos Wells, Counsel, F.C.C., Washington, D.C., for appellee. Ashton R. Hardy, Gen. Counsel, Daniel M. Armstrong, Assoc. Gen. Counsel, and Henry C. Bowen, Counsel, F.C.C., Washington, D.C., were on the brief, for appellee. Nancy B. Carey, Counsel, F.C.C., Washington, D.C., also entered an appearance for appellee.

Robert W. Coll, Washington, D.C., with whom James A. McKenna, Jr., Washington, D.C., was on the brief, for intervenor.

Before WRIGHT and WILKEY, Circuit Judges, and GESELL,* District Judge.

PER CURIAM.

■ This is an appeal from orders of the Federal Communications Commission renewing without hearing licenses to operate Stations WTVR–AM–FM–TV over the opposition of appellant Black Broadcasting Coalition of Richmond (BBC).[1] The appeal brings into issue the stations' alleged racial discrimination in employment during the 1969–1972 license period and the adequacy of WTVR's affirmative action effort both during and after that period. For the reasons set forth below we conclude that a hearing was clearly required under section 309 of the Communications Act, 47 U.S.C. § 309 (1970) and accordingly we reverse and remand for that purpose.

The WTVR stations involved in this renewal include several different facilities which due to their size and influence are a major factor in the Richmond, Virginia broadcasting market. The BBC's opposition to renewal, in brief, alleged that during the three-year license term:

(1) WTVR employed only one part-time black employee out of 62 full-time and six part-time employees at its television sta-

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1970).

1. In re Application of 1972 License Renewal Applications for 17 Broadcast Facilities Licensed to the Richmond, Virginia Area, FCC 75–938, and In re Applications of Roy H. Park Broadcasting of Virginia, Inc. For Renewal of Licenses of Stations WTVR–AM–FM–TV, Richmond, Virginia, FCC 75–939, reported at 54 FCC2d 953 (released August 13, 1975), and 54 FCC2d 995 (released August 12, 1975), respectively.

tion, and no blacks out of 26 employees at its radio stations.

(2) Qualified blacks had been available for employment but were rejected.

(3) WTVR had been involved in two instances of discrimination against blacks (each instance being supported by affidavit): one involving a refusal to hire and the other a firing.[2]

It did not require much analysis for the Commission to perceive that the situation highlighted by BBC's opposition called for a "hard look" and for prompt decisive action in the public interest. But the Commission delayed for three years and then looked only to post-license-term statistics and ignored term-time performance which, as measured by the licensee's reports to the Commission, was clearly outside the "zone of reasonableness."[3] For example, the Commission found it significant that by 1975 the percentage of blacks employed at WTVR–TV had risen to 13.7 percent and at WTVR–AM–FM to 9.5 percent. It found these figures to be within the zone of reasonableness, even though the increase at WTVR–AM–FM was due in part to attrition of white employees rather than new hiring of black employees.[4] The past history of 1.5 percent or less black employment during the license period in an area where

**2.** Appellant also alleged that the stations' initial ascertainment of community needs was defective in that it ignored the attitudes of blacks who lived outside the City of Richmond and took insufficient account of black interests within the City, which has a 42 percent black population. When the licensee in response tendered an amended ascertainment survey, appellant moved to strike it. The Commission refused to strike the amended survey, stating that appellant had not alleged that the amendment was made in bad faith. 54 FCC2d at 997. Accordingly, the Commission allowed the new survey to be filed, found it to be essentially uncontested, and held it acceptable. *Id.* at 997–998. Appellant challenges both the adequacy of the first ascertainment and the Commission's decision to allow the amended survey to be filed.

The Commission was clearly mistaken in holding that appellant had failed to allege bad faith. Appellant's motion to strike, relying on *Stone v. FCC,* 151 U.S.App.D.C. 145, 466 F.2d 316, 332 (1972), stated expressly that "[t]he licensee's stations WTVR–TV, WTVR–AM and WTVR–FM acted in bad faith in waiting until after a Petition to Deny was filed before conducting a second ascertainment survey * *." JA 450. Indeed, WTVR admitted that part of its motive in undertaking a second, massive study was to meet the "allegations of the Petitioners [appellants] with respect to the community problems survey by the WTVR Stations * * *." JA 328.

Because the Commission ignored appellant's specific allegation, and accepted WTVR's amended ascertainment as a *bona fide* amendment, it never reached the two issues raised by appellant's petition to deny and motion to strike: (a) whether WTVR's first efforts were inadequate and (b) whether WTVR had consciously acted in bad faith in performing its ascertainment survey during the license term, hoping to slide by if its renewal applications were not contested. Obviously these questions are interrelated. A showing that the first ascertainment was a good or excellent job would certainly raise an inference that WTVR was not acting in bad faith as that term is defined in *Stone, supra.* On the other hand, the policies enunciated in *Stone, supra,* would not appear to be served if the Commission were to ignore evidence of subjective bad faith in those perhaps rare cases where a licensee had thought it had performed a lackluster job, but in fact had submitted a marginally adequate ascertainment survey. Such subjective bad faith in an area as critical to the overall working of the Commission's licensing scheme as ascertainment would suggest character deficiencies of the sort which have traditionally been of concern to the Commission in granting licenses.

The purpose of the foregoing discussion is not to resolve issues, but merely to identify what issues are raised by the pleadings and by *Stone, supra.* In order to get the benefit of the Commission's analysis of these issues, we remand the ascertainment aspects of this case to the Commission for its determination whether a hearing will be required.

**3.** This case is not like *National Organization for Women (NOW) v. FCC,* 181 U.S.App.D.C. ——, 555 F.2d 1002 (1977). There this court affirmed Commission orders which found term-time statistics to be within the zone of reasonableness and which also looked to post-license-term data for the purpose of verifying that the licensees' affirmative action plans were in fact working to bring more women into the top four management levels at each challenged station.

**4.** The Commission did, however, impose reporting requirements on WTVR–AM–FM for two years following its order. This condition entailed filing a "detailed statement of the affirmative action undertaken to seek and encourage minority applicants for each job opening * * *." 54 FCC2d at 1001.

blacks constitute about one fourth of the local work force went wholly unexplored. Further, allegations of overt discrimination in hiring and firing remained contested and unsatisfied. In short, the record disclosed responsible claims that WTVR had engaged in overt discrimination at a time when its work force statistics were outside the zone of reasonableness.[5] Such a showing cannot be brushed off as "conclusory" or insubstantial as the Commission has done here.[6]

■ In addition to raising serious questions about WTVR's nondiscrimination policies, BBC hotly contested the adequacy of WTVR's efforts to reach out into the minority community to recruit qualified or qualifiable minority employees.[7] The Commission, on the other hand, found WTVR's "list of on-going community contacts [to be] calculated to routinely refer qualified Black and women applicants to the licensee, whenever a vacancy occurs, and also to maintain applications on file in anticipation of vacancies."[8] The absence of any basis for such a conclusion can be readily demonstrated by considering each element of WTVR's stated affirmative action efforts.[9]

■ First, nowhere in its application does WTVR claim it keeps minority applications on file, and an affidavit of one qualified black,[10] which stated that the station had never followed up on his contact in any way, belies any inference that WTVR used a file of qualified minority members as a basis for positive recruitment efforts. In addition, the list of community contacts tendered by WTVR reveals either that these contacts have little to do with outreach [11] and recruitment or that WTVR's involvement is contested. For example, WTVR's acceptance of referrals from the state employment office, while an indication that WTVR uses equal opportunity employment agencies, is simply inadequate under Commission guidelines to fulfill WTVR's obligation to recruit minority employees. WTVR further stated that it maintained contacts with the Special Assistant to the Governor of Virginia for Human Rights. As far as the record shows, however, the scope of this "contact" was simply

---

5. We express no view on the question whether similar allegations of discrimination would call for a hearing if the licensee's minority employment statistics had at all times been within the zone of reasonableness. *Compare,* however, Nondiscrimination in Employment Practices, 18 FCC2d 240, 241–242 (1969).

6. *See Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421 (8th Cir. 1970).

7. The Commission has repeatedly stated that licensees have a dual obligation: nondiscrimination and affirmative action. *See, e. g.,* Inquiry Into the Employment Policies and Practices of Certain Broadcast Stations Located in Florida, 44 FCC2d 735 (1974). In its first decision in the area of equal opportunity in broadcasting, the Commission noted the close tie between fairness in programming and the employment of minorities in positions of managerial and journalistic responsibility at a broadcast station. *See* Nondiscrimination in Employment Practices of Broadcast Licensees, 13 FCC2d 766, 773–775 (1968). Because of this, it is not enough for stations simply to avoid discrimination among persons who apply to them. Stations are obligated to establish contacts in their communities of license which would be likely to foster an interest in broadcasting among minorities and would also bring the station's interest to the attention of qualified

minority job-seekers. *See, e. g.,* Mission Central Company, 54 FCC2d 581, 587 (1975), *appeal pending before en banc court, sub nom. Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC,* D.C.Cir. No. 75–1855; Employment Practices in Florida, *supra,* 44 FCC 2d at 738. This position is reflected in remedial orders issued by the Commission in cases where a licensee's efforts have been passive. These orders routinely require licensees to "seek and encourage minority applicants," 54 FCC2d at 1001, by establishing "systematic communication" with "local minority and women's organizations, agencies, community leaders, schools and colleges," Employment Practices in Florida, *supra,* 44 FCC2d at 740. *See also* 47 C.F.R. § 73.680(b) (1976).

8. 54 FCC2d at 1000.

9. The Commission relied on exhibits submitted by WTVR pursuant to § VI of its renewal application. *See* 54 FCC2d at 1000. Each item mentioned in text is taken from those exhibits as amended.

10. Hairston affidavit, JA 164.

11. Outreach refers to efforts to "seek and encourage minority applicants." 54 FCC2d at 1001; *see* note 7 *supra.*

a passive acceptance of referrals, and there is no indication that more than one person was ever referred to WTVR through this channel.[12] Perhaps the best statement of WTVR's attitude toward its obligation to reach into the community to develop contacts is its response to BBC's uncontested allegation that WTVR had had *no* contact with any of the black organizations which routinely assisted minority applicants in getting jobs [13]—these groups had not been contacted because WTVR was waiting for them to come to it.[14] Such passivity is *not* what was envisioned by the Commission when it set out broadcasters' affirmative action obligations.

WTVR's involvement with the Richmond Model Neighborhood Program and with local colleges and universities, while seemingly the type of activity envisioned by Commission rules, nonetheless on analysis cannot support a finding that WTVR's affirmative action program was reasonably calculated to recruit minorities and expand interest in WTVR within the minority community. The "training" given in the Model Neighborhood Program consisted of a one-week program in one summer in which six minority youths were allowed to visit WTVR–TV and "[o]ne or two of these youths were permitted to operate a camera briefly." [15] Moreover, only two of the six persons "trained" were ever offered jobs, and WTVR apparently took no interest in

16 other youths "trained" by other stations in the Model Neighborhood Program.

WTVR's college internship programs, while clearly a step in the right direction, are conducted on a scale so small that they can make only the slightest contribution to minority hiring at WTVR. At most, these programs will train *two* persons each year. By contrast, WTVR made 35 new-hires in 1971–1972.[16] Thus the internship programs, while commendable, are not reasonably calculated to qualify minority applicants for employment in anything near the number needed if WTVR's new-hires are to contain a representative number of blacks and women.

Strangely absent from the Commission's findings is any reference to training programs designed to qualify women and blacks for better jobs. Although WTVR did represent that various individuals were given on-the-job training, one such individual denied that he was ever given the training WTVR claimed to have made available.[17] Further, there is no mention of any systematic training program. When the apparent lack of such a systematic program is set beside WTVR's stated policy of advancing persons primarily from within,[18] it appears extremely unlikely (and at least contested) that WTVR has taken reasonable steps to insure an increasing number of blacks and women among its managerial and skilled employees.[19]

---

12. The only instance of a referral mentioned by WTVR was in October 1970. *See* JA 376 (¶ 18). There is no indication of systematic communications with the Governor's office. *Cf.* note 7 *supra*.

13. This allegation was supported by the affidavit of the "Job Developer" of the Richmond Community Action Program, *see* Peyton affidavit, JA 163, the Executive Secretary of the Virginia State Conference of the NAACP, *see* Banks affidavit, JA 469, and the Associate Director of Economic Development and Employment of the Richmond Urban League, *see* Gray affidavit, JA 479, and by independent investigation by BBC, *see* JA 205.

14. *See* JA 342.

15. Petition to Prevent Continued Violation of Commission's Equal Employment Opportunities Rules, JA 203. The characterization tendered by BBC is undisputed.

16. *See* JA 403.

17. *See* Lightfoot affidavit, JA 474.

18. *See* JA 379 (¶ 24).

19. There is nothing in the record to indicate that WTVR has any sort of systematic training program, *cf.* note 7 *supra*, which would prepare minorities and women for more responsible jobs. Certainly there is nothing like the vacation-relief training programs which the Commission cited approvingly in National Broadcasting Co., Inc., 58 FCC2d 419, 425–426 (1976), *aff'd, sub. nom. NOW v. FCC, supra* note 3. The apparently *ad hoc* training policy adopted by WTVR is thus not unlike the hiring policy condemned in *Rust Communications Group, Inc.,* 53 FCC2d 355 (1975), in which the Commission ordered a hearing. There the li-

■ Finally, it must be noted that WTVR has only one centrally managed affirmative action program for WTVR–TV and WTVR–AM–FM.[20] When the Commission analyzed this program at the radio station, it found it to be passive. But this is the same program that passed muster at the television station. We simply do not understand how a program can be at one and the same time reasonably calculated to draw minorities to the station on the one hand and passive on the other.[21]

Where overt discrimination is responsibly claimed and a licensee's minority employment during the license term is below the "zone of reasonableness," a strong case for a hearing on the licensee's compliance with its obligation not to discriminate is made out. Moreover, where as here serious factual disputes raise a question about whether a licensee's affirmative action program systematically and positively encourages minority hiring, training, and advancement, a hearing must be held on the licensee's compliance with its affirmative action obliga-

censee stated that it would contact minority organizations "when suitable openings exist," rather than follow Commission guidelines that minorities be considered for all job openings. Here, so far as the record shows, WTVR has offered training to some and not to others, a practice which, when combined with the disproportionately white male makeup of WTVR's staff and its advancement-from-within promotion policy, is tantamount to limiting advancement to those it deems "suitable" for training. Such selective advancement is inconsistent with *Rust, supra,* and it is inconsistent with the Commission's professed goal of encouraging the placement of women and minorities in positions where they can influence programming choices to more "fairly reflec[t] the tastes and viewpoints of minority groups." *NAACP v. FPC,* 425 U.S. 662, 670 n. 7, 96 S.Ct. 1806, 1812, 48 L.Ed.2d 284 (1976).

**20.** "The Equal Employment Opportunity Program of this licensee * * * cover[s] all three of its stations, WTVR–TV–AM–FM, located in Richmond, Virginia. The stations are all operated from the same building, and the program is administered and controlled by the same management team." JA 80.

**21.** The Commission's conclusion concerning WTVR–AM–FM was based on the fact that minority employment, after a jump in 1973, had remained constant. On the other hand, the Commission, in accordance with its general practice, examined the statistics at WTVR–TV and found them adequate to demonstrate a working affirmative action program. We disagree. In the year immediately following BBC's petition to deny, WTVR hired six additional black employees. In the next year, however, only two and then one black was added, although total employment at the station increased by nine. The record does not reflect how many total hires WTVR made in those years, nor how many total hires were black. Similarly, the movement of blacks into the upper four job categories listed on the Form 395, after an immediate increase by five in 1973, has slowed to two and then zero. Such a pattern of minority hiring and advancement is at best

erratic and at worst demonstrates a declining trend after initial improvements. This could be excused as a statistical aberration if the record demonstrated a strong, positive minority recruitment and training program. *See Columbus Broadcasting Coalition v. FCC,* 164 U.S. App.D.C. 213, 505 F.2d 320, 329 (1974). But in the absence of a program reasonably calculated to improve minority hiring and advancement over the "long haul," such an erratic pattern following years of all-white operation cannot excuse the Commission's failure to inquire into the disputed characteristics of the program tendered by WTVR. *Cf. NOW v. FCC, supra* note 3, at ——— of 181 U.S.App.D.C., at 1015–1020 of 555 F.2d.

We recognize that WTVR's record is not as egregious as those involved in the few cases in which the Commission has ordered a hearing on employment practices, *e. g.,* Rust Communications Group, Inc., *supra* note 19; Federal Broadcast System, Inc., 59 FCC2d 356 (1976), in each of which the challenged licensee had engaged in virtually no minority hiring. Nonetheless, the fact that WTVR has hired some women and minority workers cannot shield WTVR's affirmative action efforts from scrutiny. The Commission has insisted that affirmative action is a separate obligation of licensees, independent of nondiscrimination. Accordingly, it is quite possible that a station which performs its obligation of nondiscrimination will have some minority or women employees and yet be lacking an affirmative action program of the positive sort envisioned by the Commission. Moreover, given the importance for fairness and balance in broadcasting of placing minorities and women in positions of managerial and journalistic responsibility in programming, *see e. g.,* NAACP v. FPC, *supra* note 19, 425 U.S. at 670 n. 7, 96 S.Ct. 1806, the Commission and the courts would be remiss to allow unexplored doubts about a licensee's affirmative action program to be shielded by a hopeful, but erratic and equivocal, statistical record like that compiled by WTVR in this case.

tion as well. If the "curious neutrality-in-favor-of-the-licensee" which this court has previously noted, *Office of Communication of United Church of Christ v. FCC*, 138 U.S.App.D.C. 112, 425 F.2d 543, 547 (1969), is to end, there must be a more meaningful accounting for conduct during the contested license period and more exacting standards established for the future. To accomplish that in this instance a full hearing is required both on the allegations of actual discrimination and on the licensee's performance in meeting its affirmative action obligations.

*Reversed and remanded.*