LOS ANGELES WOMEN'S COALITION FOR BETTER BROADCASTING,
Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee, CBS, Inc., Intervenor.

LOS ANGELES WOMEN'S COALITION FOR BETTER BROADCASTING,
Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee, Metromedia, Inc., Intervenor.

LOS ANGELES WOMEN'S COALITION FOR BETTER BROADCASTING,
Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee, KCOP Television, Inc., Intervenor.

Nos. 76–1133, 76–1711, and 76–1713.

United States Court of Appeals, District of Columbia Circuit.

Submitted Without Argument Sept. 19, 1977.

Decided Sept. 12, 1978.

---

MacKinnon, Circuit Judge, dissented and filed opinion.

Gloria Allred, Los Angeles, Cal., was on the brief for appellant. Tracy Western, UCLA School of Law, entered an appearance for appellant in No. 76–1133.

Werner K. Hartenberger, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Raymond L. Strassburger, Counsel, F.C.C., Washington, D. C., were on the brief for appellee.

J. Roger Wollenberg, Timothy B. Dyk, Sally Katzen, and Carol Drescher Weisman, Washington, D. C., were on the brief for intervenor CBS, Inc.

Thomas J. Dougherty and Preston R. Padden, Washington, D. C., were on the brief for intervenor Metromedia, Inc.

Howard F. Roycroft, Richard S. Rodin, and Gardner F. Gillespie, Washington, D. C., were on the brief for intervenor KCOP Television, Inc.

Before WRIGHT, Chief Judge, and ROBINSON and MacKINNON, Circuit Judges.

Opinion for the court *per curiam.*

Dissenting opinion filed by MacKINNON, Circuit Judge.

PER CURIAM:

Petitioner, the Los Angeles Women's Coalition for Better Broadcasting (WCBB), filed with the Federal Communications Commission petitions to deny the renewal applications of three Los Angeles television licensees. The Commission rejected the petitions, finding that WCBB had failed to raise any substantial and material questions requiring a hearing on the renewal applications. Petitioner then sought review in this court. We deferred our consideration of these challenges pending the decision of this court *en banc* in *Bilingual Bicultural Coalition on Mass Media v. FCC,* (D.C.Cir. No. 75–1855, decided May 4, 1978) (*Bilingual*). We now remand the records in these cases for further consideration by the Commission in light of the *Bilingual* decision.

 Petitioner's primary claim before the Commission and this court has been that the three licensees involved should not be granted immediate renewal under the applicable public interest standard, 47 U.S.C. § 309(a) (1970), because of substantial underemployment of women in their work forces. In all three cases the percentages of women employed by the licensee during the license term[1] are substantially less than the percentage of women in the Los Angeles Standard Metropolitan Statistical Area (SMSA) work force; with respect to two of the licensees, KTTV and KCOP, the percentages of women employed in the upper four job categories most closely related to a station's actual operations and programming are less than 15 percent of the percentage of women in the SMSA work force. It is petitioner's claim that, at the very least, further inquiry is required to determine the reasons for these disparities and to shape appropriate sanctions or reporting requirements to redress the underlying problems.[2]

1. As to post-term improvements, of which there is some evidence in these cases, it should be noted that while post-term statistics "may be of some relevance * * * we have never accepted, and we do not here accept, the proposition that license renewals may be granted in reliance on post-term statistics alone. To permit exclusive reliance on such statistics would be to allow licensees to discriminate throughout the term, confident that they could secure renewal by hiring minority workers *after* the term had expired. We would not permit this; we trust the FCC would not permit it either."

*Bilingual Bicultural Coalition on Mass Media v. FCC,* (D.C.Cir. No. 75–1855, decided May 4, 1978) n.42 (1978) (*en banc*) (*Bilingual*) (emphasis in original).

2. In all these cases WCBB's petitions were denied subject to any action the Commission might deem appropriate as a result of Equal Employment Opportunity Commission (EEOC) or judicial determinations in cases of specific charges of employment discrimination by the licensee then pending before EEOC. As we stated in *Bilingual, supra* note 1, "Evidence of actual discriminatory conduct in most cases

■ In *Bilingual* this court emphasized that the "public interest is not served by licensees who engage in intentional employment discrimination." Slip op. at 13. Such practices "put seriously into question a licensee's character qualifications to remain a licensee: intentional discrimination almost invariably would disqualify a broadcaster from a position of public trusteeship." Slip op. at 14. Moreover, even apart from the question of past intentional discrimination, underrepresentation of certain groups in a licensee's work force, particularly in the professional and operations categories where decisionmaking responsibility is located, may result in programming which fails adequately to serve the community. Thus we recognized as well in *Bilingual* the responsibility of the FCC "to ensure that programming reflects minority interests," a responsibility which necessitates invocation of "*prospective*, administrative sanctions—short-term license renewals and license renewals conditioned on reporting— which enable [the FCC] to monitor broadcasters' progress in recruiting and hiring minority workers." *Id.* (emphasis in original; footnote omitted).

■ This is not to say that further inquiry or sanctions are appropriate whenever there is any disparity between the available workforce in the SMSA and the licensee's own workforce. We stated in *Bilingual:*

> will present a substantial and material question of fact warranting a renewal hearing." Slip op. at 15. In these cases there is no indication of any final disposition on the charges involved.

3. This court has not required employment and population percentages to be in exact parity; we have found it sufficient if the licensee's employment figures fall within a "zone of reasonableness." *Bilingual, supra* note 1, slip op. at 11 n.15. The FCC has stated a rule of thumb that a licensee's minority or women employment is within this zone if it " 'reflects at least 50 percent of [these groups'] respective percentages in the relevant work force and 25 percent of such percentages in the station's upper-four jobs.' " *Id.,* Slip op. at 16 n.33. According to this rule of thumb, two of the

Evidence of minor statistical disparities between the available minority workforce and a station's employment, standing alone, in most cases will not warrant a hearing. Yet evidence of *substantial* statistical disparity—evidence that a licensee's minority employment is outside the "zone of reasonableness"—while it may not in itself necessarily require resolution at a hearing, *should at least put the FCC on notice that more information is required before the license renewal application can be granted. * * *

Slip op. at 15–16. (first emphasis in original, last emphasis added; footnotes omitted).[3]

■ Where further information is needed the FCC may either conduct its own inquiry or afford the petitioner an opportunity to conduct discovery. If it chooses the first alternative, however, the Commission must ensure that the petitioner has a meaningful opportunity to examine and comment on the information received. As we stated in *Bilingual,* "The full report of the Commission's investigation, including all evidence it receives, must be placed in the public record, and a stated reasonable time allowed for response and rebuttal by petitioners. These procedures will permit meaningful participation by petitioners without necessitating potentially burdensome discovery." Slip op. at 26.

three licensees challenged here—KTTV and KCOP—fail to fall within the zone of reasonableness with respect to their employment of women. Moreover, the zone of reasonableness must contract over time, *id.,* and substantial disparities, such as those claimed with respect to all three licensees, may necessitate further inquiry and action even if falling slightly short of the rule of thumb definition of reasonableness. This is particularly true where, as is alleged here, recruitment efforts are not in fact aggressive and result-oriented; where similar recruitment efforts have failed to produce significant or lasting improvements in the past, at a minimum Commission monitoring may be necessary to ensure that there will indeed be improvements in the future, as the zone of reasonableness contracts.

The cases before us now were decided by the Commission before our decision in *Bilingual*. Because we believe the Commission should have the opportunity, in the first instance, to apply the principles we announced and clarified in *Bilingual* to the facts of these cases, we remand the records before us now to the Commission for further consideration in light of that decision.

*So ordered.*

MacKINNON, Circuit Judge, dissenting:

In remanding these cases to the FCC for further consideration in the light of our recent *en banc* decision in *Bilingual Bicultural Coalition on Mass Media v. FCC*, (No. 75–1855, D.C.Cir., May 4, 1978) (hereafter "*Bilingual II*"), when to my mind *Bilingual* calls for an affirmance of the FCC, the majority asserts three bases for its action.

First the majority states:

In all three cases [KNXT, KCOP, KTTV] the percentages of women employed by the licensee during the license term are substantially less than the percentage of women in the Los Angeles Standard Metropolitan Statistical Area (SMSA) work force . . . .

This is true for a number of reasons, but neither this court nor the FCC has ever required full parity between the percentage of a given group employed at a licensee and the percentage of that group in the area work force. In the case of these three stations, it appears that for two of them the total percentage of women employed in the total work force of each station was, for *every year during the license term*, within the 50% parity "rule of thumb" for determining the "zone of reasonableness" and in the case of KNXT that station during the

first two years of its license term exhibited 47.2% and 49% parity respectively, and exceeded 50% in the third year of its license. In addition, the Commission found that KNXT had a vigorous affirmative action program and that its "practices and policies exhibit a result oriented, affirmative commitment towards hiring minorities and women." The complete figures for the three stations are as follows [1]:

### KNXT

| Year | Parity * | A | Parity * | B |
|------|----------|-------|----------|-------|
| 1972 | 47.7 | 18.61 | 16.1 | 6.30 |
| 1973 | 49.2 | 19.21 | 21.7 | 8.44 |
| 1974 | 57.7 | 22.49 | 33.3 | 12.99 |

### KCOP

| Year | Parity * | A | Parity * | B |
|------|----------|-------|----------|-------|
| 1972 | 54.5 | 21.25 | 8.1 | 3.15 |
| 1973 | 50.6 | 17.73 | 1.0 | 3.96 |
| 1974 | 64.5 | 25.17 | 13.8 | 5.37 |
| 1975 ** | 68.4 | 26.66 | 23.8 | 9.27 |

### KTTV

| Year | Parity * | A | Parity * | B |
|------|----------|-------|----------|-------|
| 1972 | 59.8 | 23.33 | 11.6 | 4.54 |
| 1973 | 58.6 | 22.86 | 16.3 | 6.36 |
| 1974 | 62.2 | 24.27 | 16.6 | 6.47 |
| 1975 ** | 61.8 | 24.12 | 23.3 | 9.09 |

A—Percentage of all employees at station who are *women*

B—Percentage of employees in the upper four job categories at the station

*—Percentage that women employees in station bear to women employees in entire area

**—Post-term

The second assertion by the majority is that—

. . . with respect to two of the licensees, KTTV and KCOP, the percentages of women employed in the upper four job categories most closely related to a station's actual operations and programming are less than 15 percent of the percentage

1. The figures for KNXT are found in Brief for Intervenor CBS, Inc. in No. 76–1133 at page 17 n.24 and pages 17–18 n.26. The figures for KCOP are found in In re Application of KCOP Television Incorporated, 57 F.C.C.2d 227, 229 (1975). The figures for KTTV are found in In re Application of Metromedia, Inc., 57 F.C.C.2d 227, 280 (1975).

Based on the 1970 census, *General Population Characteristics,* Final Report, PC(1)–B6 California, roughly 50% of the population in

the Los Angeles area is female, and women comprise 39% of the area (SMSA) work force.

The parity figures have been calculated for this opinion. Due to differences in rounding techniques and extremely minor disputes concerning the actual statistics, slightly different figures are found at different places in the record. For example, the record showed parity in 1975 for KCOP at 67% and for KTTV at 61.5% and in 1974 of 56% for KCOP.

of women in the SMSA work force. . .

Majority op. at —— of 190 U.S.App.D.C., at 1091 of 584 F.2d. No authority is cited for these figures and their source and accuracy are not easily checked. Apparently they are based on the KCOP and KTTV employment records during the license period, although in 1974 by my checking the figure for women in the "upper four job categories," KTTV was somewhat over 16%, not under 15%. When the majority seeks to rely on these statistics it overlooks the dramatic increase in the number of women in these job categories in 1975 in the two stations. The FCC found that the attitude which caused this dramatic increase was clear proof of the vigor of the affirmative action programs, and of the unbroken trend of increasingly large percentages of women in these upper level jobs during the license period itself. The zone of reasonableness "rule of thumb" figure of 25% parity with the percentage of women in the workforce as being a "reasonable" percentage of women to have in the upper four job categories is not a rigid requirement, and in light of the affirmative action programs of these stations and the overall reasonableness of their percentage of women employees, the Commission was fully justified in renewing these stations' licenses without further investigation.

Further, in footnote 3 the court states:
. . . two of the three licensees challenged here—KTTV and KCOP—fail to fall within the zone of reasonableness with respect to their employment of women.

This statement does not refer to any particular year so it is hard to determine what period of time the majority is referring to and it does not specify whether it is based on overall employment or employment in the upper four job categories. Since all stations exceed the "rule of thumb" reasonableness standard for 1975 for total women employees, it can only be referring to 1974, and to a much less degree to 1975. As heretofore stated, neither KCOP nor KTTV had a sufficiently high percentage of wom-

en employed within the top four job categories to come within the "rule of thumb" reasonableness standard. For a station to be within the "zone of reasonableness," it must employ in the upper four job categories at least 25% of the percentage of women in the SMSA work force. While both KCOP and KTTV are extremely close to this figure in 1975, they were not as of 1974. But it is the present and the future that is the principal concern, not the past. This slight numerical failing that presently exists is more than compensated for by the fact that the FCC explicitly found that both these stations had effective and diligently pursued affirmative action programs. At KNXT, the Commission found that its "practices and policies exhibit a result oriented, affirmative commitment towards hiring minorities and women," In Re Application of Metromedia, Inc., 57 F.C.C.2d 277, 281 (1975). At KCOP the FCC discerned "substantial efforts to recruit, hire, and promote" women employees, In Re Application of KCOP Television, Incorporated, 57 F.C.C.2d 227, 229 (1975). In neither 1974 nor 1975 did either KTTV or KCOP fall outside the "zone of reasonableness" insofar as total employment of women was concerned. With these facts in mind we review Bilingual II to determine its application to the action of the FCC with respect to renewals it granted to the three stations here in issue.

In Bilingual II, supra, we upheld the action of the FCC in renewing, without further investigation, the operating license of station KCBS against which a petition to deny had been filed alleging discrimination against Asians at the station. The record in Bilingual II reflects that in 1975, action there taken by the Commission is the same as that taken in the case of the stations whose license renewals are here presented for review. In 1975, the year after the station's previous license term expired, the employment of Asians at KCBS was at 56% parity with the percentage of Asians in the SMSA work force. This is to be compared with the FCC's "rule of thumb" figure of 50% parity for determining when a station's employment profile is within the "zone of

reasonableness" sanctioned by this court in several cases.[2] In renewing the license, the Commission also noted the presence of an affirmative action program at the station and dismissed the petitioners' allegations of discriminatory programming, relying primarily on the doctrine that "a licensee has wide discretion in the area of programming," WOIC, Inc., 39 F.C.C.2d 355, 367 (1973).[3] In *Bilingual II* we then affirmed the Commission's action stating that "in view of these findings, as well as the absence of any allegation of overt discrimination, the FCC properly concluded that no substantial and material question of fact had been raised and that renewal without prospective remedies was consistent with the public interest." [4]

In the three cases before us in this consolidated appeal, the Women's Coalition for Better Broadcasting raised virtually identical charges of programming discrimination against KCOP, KTTV and KNXT as were raised against KCBS, and the FCC rejected them on much the same grounds as it had in *Bilingual II*.[5] In our opinion in *Bilingual II* there is nothing to intimate that any reason exists for the Commission to reconsider its rejection of appellants' challenge to the stations' programming.[6] Nothing in the opinion even discusses that possibility.

With respect to the employee status of the three stations here involved the record before us shows that in 1975 KTTV had 59% parity with the percentage of women in the Los Angeles SMSA work force; and KCOP had a 67% parity in that year. Both these figures are, needless to say, more favorable to the licensee than those on which we relied in affirming the license renewal of KCBS without further investigation in *Bilingual II*. The 1975 figure was unavailable for KNXT, but in 1974, the station's employment profile showed a 56% parity with the SMSA work force. This is the same figure that we found for KCBS in 1975.

The Commission's decision in renewing KCBS's license did not present any summary of the employment profile of the station

---

2. *See Black Broadcasting Coalition v. FCC*, 181 U.S.App.D.C. 182, 556 F.2d 59 (1977); *NOW v. FCC*, 181 U.S.App.D.C. 65, 555 F.2d 1002 (1977); *Bilingual Bicultural Coalition of Mass Media, Inc. v. FCC (Bilingual I)*, 160 U.S.App. D.C. 390, 492 F.2d 656 (1974). Although the 50%/25% parity guidelines were developed by the Commission, the "zone of reasonableness" concept was in fact adopted by this court and then applied by the Commission, *see Bilingual II*, dissenting slip op. at 19; In re Application of Metromedia, Inc., 57 F.C.C.2d 277, 280 n.11 (1975).

3. In re Application of CBS, Inc., 56 F.C.C.2d 296, 300 (1975).

4. *Bilingual II*, slip op. at 20–21.

5. In re Application of KCOP Television, Inc., 57 F.C.C.2d 227, 232–235 (1975); In re Application of Metromedia, Inc., *supra* note 2, 57 F.C.C.2d at 281–284; In re Application of CBS, Inc., 57 F.C.C.2d 505, 516–521 (1976).

6. No mention is made of the allegations concerning programming in *Bilingual II*. In the cases presented on this appeal, the FCC rejected the WCCB's claims in this record out of hand, also emphasizing the "considerable discretion" vested in a licensee to choose programming responsive to the needs of its public, *see, e. g.*, Brief for Appellee in No. 76–1133 at 23, citing *United Church of Christ v. FCC*, 123 U.S.App.D.C. 328, 359 F.2d 994, 1007 (1966).

The meritless nature of appellants' programming arguments is manifest from reading the Commission's discussion of these charges in any one of its decisions, 57 F.C.C.2d 281–284; 57 F.C.C.2d 516–521; 57 F.C.C.2d 232–235. Typical of the attention that the Commission thought was merited by these arguments is the following passage from the Commission's order renewing KTTV's license:

> In view of the licensee's past programming, we cannot accept the petitioner's argument that the licensee has responded to women's interest through only two programs. The Commission find no merit to the coalition's allegations, specifically that the needs of women have not been served by KTTV–TV. We reject the argument that women's problems or interests were only addressed by programs specifically designed for the female viewer. Therefore, we believe, KTTV's past programming, contrary to the Coalition's allegation demonstrates that the licensee has presented programs devised specifically for women "as well as programming which has a wider range of appeal." Taft Broadcasting Co., 38 F.C.C.2d 770, 792 (1973).

There is nothing in *Bilingual II* that would supply *any* reason for the Commission to alter this opinion or the similar decisions reached concerning KCOP and KNXT's programming.

during the license term, due apparently to the absence of meaningful annual figures during this period resulting from the quick turnover of Asians employed between 1971–1974.[7] It is, accordingly, difficult to compare precisely the license term employment records of KCBS with those of KTTV, KCOP and KNXT. The most significant available point of comparison is the fact that the FCC explicitly found that the employment profiles of all three stations for all women employees were within the zone of reasonableness.[8] Indeed, in the cases of KTTV, KCOP and KNXT, the Commission, having workable license term statistics before it, discussed these records in detail and found them to be reasonable,[9] and used the dramatic post-term improvements it observed[10] to corroborate its judgment that no substantial question of discrimination on the part of the stations was thereby presented. Although in the last year of the license term KCBS has a remarkable 98%

parity figure—exceeding that of any of the stations herein question—in view of the rapid drop in this figure (as opposed to the general improvement during the same period in the employment figures for KTTV, KCOP and KNXT in 1975 and the uncertainty of the data during the first two years of the license period), KCBS's employment record cannot credibly be said to be any more impressive than those of the intervenors in this appeal.[11] If anything, it appears that the employment profiles of the latter can—due to availability of better statistical analyses—more confidently be found to be reasonable (and thus these stations' licenses more properly renewed without further investigation) than those of KCBS.

The station, KONO, whose license renewal we remanded in *Bilingual II* for further consideration by the Commission presents a marked contrast to any of the stations dis-

7. In re Application of CBS, Inc., *supra* note 3, 56 F.C.C.2d at 302.

8. The fact that the Commission found the employment figures to be within the zone of reasonableness and that the stations' licenses should be renewed is entitled to considerable deference. "If the Commission's action in granting those renewals 'was not arbitrary, capricious, or unreasonable, we must affirm.'" *Bilingual II*, slip op. at 19, quoting from *Columbus Broadcasting v. FCC*, 164 U.S.App. D.C. 213, 217, 505 F.2d 320, 324 (1974).

9. There has been no suggestion, nor does the majority suggest, that the Commission's examination of the figures in question has been anything but thorough. The scrutiny with which the FCC investigated any plausible claims of discrimination involving the intervenor licensees is indicated by the fact that the Commission did impose additional reporting requirements on KCOP concerning its "progress in recruiting qualified minority personnel" in light of what the FCC considered a "weak" KCOP employment profile for minorities. 57 F.C.C.2d at 230.

It is also worth noting in regard to KTTV in particular, that the station's employment record in regard to other minority groups was so impressive that the Commission considered that it merited special mention. The total minority availability in the Los Angeles SMSA work force was only 29.1%. At KTTV there were 23.30% minority workers in all jobs and 12.94% in the upper four job classifications in

1974 and 23.11% minorities in all jobs and 15.38% in the upper four occupational groups in 1975. These statistics heighten the implausibility of the claim that KTTV is a discriminatory employer. 57 F.C.C.2d at 281.

10. KTTV and KCOP, the only stations whose 1975 employment profile appears in this record showed significant increases in the number of women employed in the top four job categories. At KTTV, this figure increased from 6.5 to over 9%. Indeed, the four person increase in upper four job category employees in 1975 appears to have been constituted entirely of new upper level women employees, 57 F.C.C.2d at 280–281. KCOP also showed a major increase in the percentage of women employed in the upper four job levels in 1975, this percentage jumping from 5.3% to 9.2% (an increase of approximately 73%). In view of this record, the majority's comment that "there is some evidence" of post term improvements, Majority opinion at —— n.1 of 190 U.S.App.D.C., at 1091 n.1 of 584 F.2d, is patently misleading. Actually there is "overwhelming proof" of these licensees' commitment and successful pursuit of an affirmative hiring policy as regards women.

11. Moreover, the small representation of Asians in the SMSA workforce makes the KCBS statistics somewhat susceptible to misinterpretation. Thus, although in 1974 the station had over 90% parity and in 1975 under 60%, the numerical difference in the Asians employed was only 3.

cussed above. In responding to a petition to deny filed by a Mexican-American group the FCC found not only that the employment of Mexican-Americans was outside the zone of reasonableness, but also that the percentage of Mexican-Americans in the station's work force had remained "static" for four years and that the station's affirmative action program was "passive." [12] Our remand in *Bilingual II* of the Commission's refusal, on such an abysmal record as that presented by KONO, to investigate further allegations of discrimination does not provide any authority for the remand "for further consideration" of the renewal applications of stations with such enormously different employment histories as KTTV, KCOP or KNXT. While the Commission found the KONO employment profile specifically to be outside of the zone of reasonableness, it found exactly the opposite for these other three stations. Such fact was considered important by the court in *Bilingual II.*[13] In the case of KTTV and KCOP, it also explicitly praised the licensees' affirmative action program both in terms of increasing total employment of the minority in question and of the employment of this group in the upper four job categories.

*Bilingual II* established no precise statistical cut-off points for determining when the FCC should be required to conduct further inquiries into allegations of employment discrimination; nor would any rigid lines be appropriate in view of the flexible nature of the "zone of reasonableness concept" adopted by the FCC following our earlier declaration. It is, therefore, impossible to assert that *Bilingual II compels* this court to affirm the Commission's actions in the license renewals now under consideration. Instead, the similarities between KCBS and KTTV, KCOP and KNXT and the dissimilarities between all these stations and KONO are so marked that it cannot be said that *Bilingual II* provides any support for a remand in these cases. At the very least, the majority should provide some more reasoned explanation of its decision to remand than merely to state that "we believe the Commission should have the opportunity, in the first instance, to apply the principles we announced and clarified in *Bilingual.*"[14] On the figures presented here, these "principles" would strongly suggest that the license renewals should be summarily affirmed rather than remanded, particularly as *Bilingual II* emphasized the limited scope of our review of FCC action on license renewals.[15]

In conclusion, it is important to underscore the extent to which the panel's remand of these appeals on the alleged authority of *Bilingual II* seriously distorts the

12. *Bilingual II*, slip op. at 24.

13. *Id.*, at 24 ("We think that these findings, taken together [employment profile out of the zone of reasonableness and a "passive" affirmative action program], created a factual uncertainty as to whether KONO had engaged in intentional discrimination during the expiring license term.")

14. In view of the unquestioned acceptance of a zone of reasonableness approach, the majority's comment that "In all three cases the percentages of women employed by the licensee during the license term are substantially less than the percentage of women in the Los Angeles Standard Metropolitan Statistical Area (SMSA) workforce," Majority opinion at —— —— of 190 U.S.App.D.C., at 1091 of 584 F.2d is plainly misleading. Disparities far more significant than those found in the case of licensees in question here have previously been approved as within the zone of reasonableness, see, e. g., *Alianza Federal de Mercedes v. FCC,*

176 U.S.App.D.C. 253, 539 F.2d 732 (1976); *Bilingual Bicultural Coalition of Mass Media, Inc. v. FCC,* 160 U.S.App.D.C. 390, 492 F.2d 656 (1974); *Stone v. FCC,* 151 U.S.App.D.C. 145, 466 F.2d 316 (1972). The mere existence of "substantial disparities" provides no justification for remanding these appeals.

15. *Bilingual II*, slip op. at 18–19. "Finally, then we come to the question before us: whether the FCC in these cases had sufficient information to make an informed decision that the licensees had not engaged in intentional discrimination during the expiring license term. In answering this question, of course, 'the scope of our review is quite narrow;' " we sit to review *two* license renewal orders, not to restructure the FCC's information-gathering process. If the Commission's action in granting those renewals "was not arbitrary, capricious or unreasonable, we must affirm."

impact of that decision. A principal emphasis in our opinion in *Bilingual II* was on the need for expedition in the handling of the numerous renewal requests received by the FCC each year [16] and on the fact that the FCC was not a surrogate Equal Employment Opportunity Commission charged with promoting the policies of the EEOC instead of the broader "public interest" embodied in the Federal Communications Act.[17]

The employment discrimination claims advanced in the appeals before us in these cases are on their face unfounded and the Commission's disposition of them should receive summary affirmance. Moreover, the petitions to deny filed in the three separate cases here were practically boilerplate and presented largely meritless objections to the license renewals. The three briefs are also essentially identical. In fact, the appellants used the same brief and only changed the appellee's name to such an extent that in one of their briefs by mistake they inserted "KNXT" rather than "KTTV." [18] The Commission must be allowed to deal expeditiously and summarily with such petitions if the present system of triennial license renewals is to function at all. By remanding these appeals to the Commission for further consideration in light of *Bilingual II*, the court implicitly suggests that this opinion should be viewed as arguably requiring the FCC to adopt significantly more rigorous standards, or at least apply a closer scrutiny under existing standards, in evaluating the reasonableness of a station's equal employment record. Whatever misgivings the other members of this panel may have had concerning the outcome of *Bilingual II*, candor compels recognition of the fact that that decision cannot justifiably be interpreted in a light that would call for the remand of these cases.[19] In directing the remand of these cases, in my view, the majority is overreaching its appellate jurisdiction and distorting our own *en banc* decision on which the ink is barely dry.[20] I respectfully dissent.

---

16. "The Commission considers over 3,000 license renewal applications each year; to require that its 13 Administrative Law Judges assume the burden of passing upon the propriety of an inevitable host of interrogatories would create a regulatory nightmare." *Bilingual II*, slip op. at 27.

17. "This is not to say, of course, that the FCC in considering license renewals is charged with an undifferentiated mandate to enforce the antidiscrimination laws: the FCC is not an Equal Employment Opportunity Commission (EEOC), and a license renewal proceeding is not a Title VII suit." *Bilingual II*, slip op. at 13.

18. *See* page 3 of the Certificate of Counsel attached to WCCB's brief in No. 76–1711. For a similar omission indicating the "boilerplate" nature of the Coalition's claim, *see* Appellant's Brief in No. 76–1711 at 35.

19. One need only compare the excerpts from *Bilingual II* cited by the majority with the entirety of that opinion to appreciate the extent to which the majority has not presented a completely accurate picture of that opinion.

At the very least, it is indefensible to remand the renewals of KCOP and KTTV. In the former the Commission found that the station's Equal Employment Opportunity program was alive and well, making "substantial efforts to recruit, hire, and promote" female employees, 57 F.C.C.2d at 229. In the latter the FCC found that the licensee's practices and policies exhibit a result oriented, affirmative commitment towards hiring minorities and women, 57 F.C.C.2d at 281.

20. *Vermont Yankee Nuclear Power Corp. v. N.R.D.C.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). The action of the majority seems particularly inappropriate in view of our explicit *en banc* statement in *Bilingual II* that our opinion in that case was "designed to state definitively the position of this Court on the issues raised and to govern related cases in the future." *Bilingual II*, slip op. at 5.