**METRO–ACT OF ROCHESTER, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Rust Communications Group, Inc., Intervenor.

**ACTION FOR A BETTER COMMUNITY, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

Rust Communications Group, Inc., Intervenor.

Nos. 79–2034, 79–2037.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 27, 1981.

Decided Oct. 30, 1981.

As Amended May 18, 1982.

---

Nolan A. Bowie, Washington, D. C., with whom Jeffrey H. Olson was on the brief, for appellant in No. 79–2037. Wilhelmina Reuben Cooke, Washington, D. C., also entered an appearance for appellant in No. 79–2037.

Donald W. Strickland was on the brief, for appellant in No. 79–2034.

Jane E. Mago, Counsel, F. C. C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F. C. C., Washington, D. C., were on the brief, for appellee.

Stanley S. Neustadt, Lawrence N. Cohn and N. Frank Wiggins, Washington, D. C., were on the brief, for intervenor.

Before ROBINSON, Chief Judge, McGOWAN, Senior Circuit Judge, and PARKER, District Judge.*

Opinion filed PER CURIAM.

PER CURIAM:

Appellants challenge an order of the Federal Communications Commission granting short-term license renewals for two radio stations. Appellants claim that the Commission improperly considered the licensee's [1] equal employment opportunity (EEO) statistics for a period postdating the expired license term,[2] and that the licensee disregarded Commission regulations so flagrantly as to necessitate nonrenewal. Finding no legal impropriety in the Commission's exercise of its authority and discretion, we affirm.

I

In 1972, Rust Communications Group, Inc., applied to the Commission for license renewals for radio stations WHAM and

---

\* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. Both stations were licensed to a single corporation, Rust Communications Group, Inc., the applicant for the renewals.

2. The licenses of both stations expired on the same date. See note 24 *infra*.

WHFM, in Rochester, New York.[3] The applications were contested by two local organizations, Metro-Act of Rochester, Inc., and Action for A Better Community, Inc.,[4] the appellants here. The grounds of opposition essentially were that Rust had failed adequately to ascertain and serve the needs of the community, and had engaged in employment practices discriminating against minorities.[5]

The Commission concluded that appellants had identified serious flaws in Rust's applications[6] and had, through statistical data, made a prima facie showing of employment discrimination as well.[7] Accordingly, the Commission scheduled a hearing and designated a variety of issues for exploration. Included were whether Rust had properly ascertained, and had been reasonably responsive to, community problems and needs; whether it had made a good faith effort to meet its public affairs programming commitment; whether it had violated the Commission's equal employment opportunity rules; and whether sanctions should be imposed upon the licensee.[8]

After completion of the hearing, an administrative law judge agreed that Rust's applications presented troublesome questions. Rust's affirmative action efforts during the term of the licenses, characterized as "minimal"[9] and "far from vigorous and continuing,"[10] led the judge to observe

"that until 1976, the [EEO] record . . . could not have been much poorer,"[11] and that "[i]f that record was the sole criterion, the denial of the renewal applications would be warranted."[12] But Rust's post-term statistics—those for the period after the Commission issued its designation order—presented a rosier picture. Affirmative action had been "notably intensified,"[13] there had been a dramatic increase in the number of minority and women employees at the two Rochester stations,[14] and, the judge found, "the licensee appears to be seriously pursuing a training program for minority" applicants.[15] The judge concluded that Rust's post-designation affirmative action endeavors warranted a one-year renewal of the licenses, coupled with detailed accountings by Rust of steps taken and progress made in the direction of equal employment opportunity.[16]

The judge's findings on other issues did not alter his determination that short-term renewal was appropriate. While Rust's attempts to ascertain community problems were defective, said the judge, "[o]n the basis of the record, it appears that despite the deficiencies, [Rust] did in fact propose programming to meet the most pressing community problems or needs which were ascertained," and "there is no evidentiary support for a finding that problems other than those ascertained existed."[17] Fur-

---

3. See *Rust Communications Group, Inc.*, 73 F.C.C.2d 61 (1977) (initial decision of administrative law judge).

4. See *Rust Communications Group, Inc.*, 53 F.C.C.2d 355 (1975) (memorandum opinion and order).

5. *Id.* at 361–362.

6. *Id.* at 358, 360–361.

7. *Id.* at 363–364.

8. *Id.* at 364–365. Another issue—whether programing at the two stations was so meritorious as to overcome deficiencies in other areas— was later added at Rust's request. *Rust Communications Group, Inc.*, 54 F.C.C.2d 419 (Review Bd. 1975) (memorandum opinion and order). Rust, however, did not meet its burden of proof on this issue, see *Rust Communications Group, Inc.* (initial decision), *supra* note 3, 73

F.C.C.2d at 142–143. *Rust Communications Group, Inc.*, 73 F.C.C.2d 39, 57–58 (1979) (Commission decision), and it is not now before us.

9. *Rust Communications Group, Inc.* (initial decision), *supra* note 3, 73 F.C.C.2d at 138.

10. *Id.* at 139.

11. *Id.* at 140.

12. *Id.*

13. *Id.* at 139.

14. *Id.* at 140.

15. *Id.* at 141.

16. *Id.* at 144–145.

17. *Id.* at 126 (footnote omitted).

thermore, the judge continued, "the non-entertaining programming of [the stations] was reasonably responsive to community needs and problems during the periods, 1969–1972 and 1972–1975." [18] Similarly, while Rust's public affairs responsibilities were not entirely fulfilled, it had "made reasonable and good faith efforts to meet its 1969 Public Affairs commitment." [19]

From this initial decision appellants went to the Commission,[20] contending among other things that the administrative law judge erred in considering post-term data on the equal employment opportunity issue.[21] The Commission disagreed, however. While "post-term *programming* improvements will be discounted and given little weight in a renewal proceeding," it noted, "[b]y contrast, to date it has been the Commission's policy routinely to consider the post-term results of licensees' EEO programs ... so long as responsible allegations of specific acts of intentional discrimination or other possible evidence of intentional discrimination are not left unexamined." [22] The Commission thus concluded that Rust's post-term upgrading was relevant and, since intentional discrimination was not urged,[23] it approved the one-year renewals[24] as "harmoniz[ing] with the actions we have taken on the renewal applications of other licensees who were responsible for deficient affirmative action implementation during the same period explored in this proceeding." [25]

Appellants' contentions on ascertainment, programing responsiveness and public affairs were given short shrift. The Commission agreed with the administrative law judge that Rust's shortcomings were essentially harmless,[26] and "affirm[ed] his position that the outcome of these issues did not materially affect the sanction appropriate in this case." [27]

The Commission did, however, use the occasion to announce a new equal employment opportunity policy. Future renewal applicants could safely rely only on statistics generated during the license term; "[w]e will not consider post-term EEO evidence at all," the Commission stated, "if the licensee's term-time EEO record is so deficient that it, standing alone, would warrant denial of renewal or other sanctions." [28] Rust was exempted from this policy because the Commission believed that the broadcasting industry had not fully understood the requirements in vogue during the 1969–1975 period, when the events relevant here transpired.[29]

Only Rust sought Commission reconsideration, which was denied.[30] Appellants, on the other hand, brought their grievances directly here.

## II

Appellants assert principally that the Commission cannot look to post-term

---

18. *Id.* at 136. See note 24 *infra.*

19. *Id.* at 133.

20. So did Rust, seeking a full three-year renewal period. Its arguments were rejected by the Commission, *Rust Communications Group, Inc.* (Commission decision), *supra* note 8, 73 F.C. C.2d at 46–48, and were not brought before us.

21. *Id.* at 48–50.

22. *Id.* at 49 (emphasis in original) (footnotes omitted).

23. The administrative law judge did not make an ultimate finding on intentional discrimination, *id.* at 47 n.11, and appellants did not claim before the Commission that Rust's practices were so motivated. *Id.* On the evidence before it, the Commission was "satisfied that no such pattern existed." *Id.* Appellants do not assert the contrary here.

24. The expiration date of each of Rust's licenses was July 1, 1972. Rust filed timely applications on March 2, 1972, for renewal for 1972–1975 terms. When, however, applications became due for the 1975–1978 license periods the Commission had not acted, so it treated additional renewal applications submitted by Rust on February 3, 1975, as supplements to the pending 1972 requests. *Id.* at 40 n.1.

25. *Id.* at 50 (footnote omitted).

26. *Id.* at 54–57.

27. *Id.* at 57.

28. *Id.* at 53 (footnote omitted).

29. *Id.* at 51, 53.

30. *Rust Communications Group, Inc.,* 75 F.C.C. 2d 445 (1980) (order on reconsideration).

EEO statistics in licensing proceedings, and that without them the license renewals in Rust's favor were improper.[31] The Commission points out, in response, that both it and this court have regularly resorted to such statistics in the past.[32] Undeniably, until adoption of its new policy, the Commission has not balked at considering post-term EEO statistics,[33] and that practice has been accepted by the court "without discussion."[34] Indeed, we have expressly rejected the argument that the Commission must disregard post-term employment data,[35] noting that the Commission has a proper role in "seeking to lead a licensee who has not possessed an adequate affirmative action program in the past to adopt policies ensuring [one] ... in the future."[36] It cannot be gainsaid that, in this context, post-term data have a "distinct relevance."[37]

■ Appellants argue, however, that the use of such statistics is barred by our decisions in *Bilingual Bicultural Coalition v. FCC*[38] and *Los Angeles Women's Coalition v. FCC*,[39] where we declared that "we have never accepted, and we do not here accept, the proposition that license renewals may be granted in reliance on post-term statistics alone."[40] On close inspection, however,

it becomes clear that both cases support the Commission's disposition here. In *Bilingual Bicultural Coalition*, we held that the Commission, when it finds a licensee's EEO efforts inadequate, may appropriately "invoke[] *prospective*, administrative sanctions—short-term license renewals and license renewals conditioned on reporting—which enable it to monitor broadcasters' progress in recruiting and hiring minority workers."[41] To be sure, we also concluded that the Commission's approach cannot be wholly prospective because "intentional discrimination almost invariably would disqualify a broadcaster from a position of public trusteeship."[42] And since "substantial statistical disparity, especially when coupled with a languishing affirmative action plan, raises questions as to whether the station's poor EEO performance owes to inadvertence, or to intentional discrimination,"[43] we admonished that the Commission, when faced with such a situation, must determine—by hearing or otherwise—what caused the disparity and what should be done about it.[44] In this light, the language relied on by appellants must be seen as meaning that post-term statistics cannot be used to nullify proven in-term *intentional* discrimination.[45]

**31.** Brief for Appellant Action for a Better Community at 19–27; Brief for Appellant Metro-Act of Rochester at 13–18.

**32.** Brief for Respondent at 18–21.

**33.** See, *e. g., National Broadcasting Co.,* 58 F.C.C.2d 419, 422 (1976), *aff'd sub nom. NOW v. FCC,* 181 U.S.App.D.C. 65, 555 F.2d 1002 (1977).

**34.** *NOW v. FCC, supra* note 33, 181 U.S.App. D.C. at 76, 555 F.2d at 1019. Accord, *Columbus Broadcasting Coalition v. FCC,* 164 U.S. App.D.C. 213, 505 F.2d 320 (1974).

**35.** *NOW v. FCC, supra* note 33, 181 U.S.App. D.C. at 76, 555 F.2d at 1019.

**36.** *Id.* at 74, 555 F.2d at 1017, quoting *National Broadcasting Co., supra* note 33, 58 F.C.C. 2d at 422.

**37.** *NOW v. FCC, supra* note 33, 181 U.S.App. D.C. at 76, 555 F.2d at 1019.

**38.** 193 U.S.App.D.C. 236, 595 F.2d 621 (*en banc*) (1978).

**39.** 190 U.S.App.D.C. 108, 584 F.2d 1089 (1979).

**40.** *Bilingual Bicultural Coalition v. FCC, supra* note 38, 193 U.S.App.D.C. at 246 n.42, 595 F.2d at 632 n.42; *Los Angeles Women's Coalition v. FCC, supra* note 39, 190 U.S.App.D.C. at 110 n.1, 584 F.2d at 1091 n.1, quoting *Bilingual Bicultural Coalition v. FCC, supra* note 38, 193 U.S.App.D.C. at 246 n.42, 595 F.2d at 631 n.42.

**41.** *Bilingual Bicultural Coalition v. FCC, supra* note 38, 193 U.S.App.D.C. at 243, 595 F.2d at 628 (emphasis in original) (footnote omitted).

**42.** *Id.* at 244, 595 F.2d at 629.

**43.** *Id.* at 245, 595 F.2d at 630.

**44.** *Id.* at 244–245, 595 F.2d at 629–630.

**45.** In full, the passage relied on by appellants is:

Although post-term statistics may be of some relevance under the Commission's prospective approach ... we have never accepted, and we do not here accept, the proposition

■ A similar course was taken in *Los Angeles Women's Coalition.* Finding indications of substantial statistical disparity between the makeup of the licensee's workforce and that of the relevant labor market, we declared that "the 'public interest is not served by licensees who engage in intentional employment discrimination,' " [46] and explained that "underrepresentation of certain groups in a licensee's workforce . . . may result in programming which fails adequately to serve the community." [47] We therefore held that further consideration was there necessary to determine whether there had been intentional discrimination and, if not, to see whether "passive" underrepresentation of protected groups required "'*prospective* administrative sanctions'" such as short-term license renewals.[48]

The Commission's course in the instant case observed these guideposts. Noting Rust's poor EEO record, the Commission set a hearing, thereby affording appellants a chance to show specific acts of intentional discrimination. After they failed to do so,[49] the Commission imposed administrative sanctions prospectively. Our decisions leave little room for debate on the propriety of that procedure.[50]

■ Appellant Action for a Better Community, however, also takes an alternative tack, arguing that it was irrational for the Commission to exempt Rust from its new policy on the use of post-term EEO statistics.[51] Again, we believe the Commission's action was appropriate. As late as July, 1975—two months after the designation order issued in this case—the Commission acknowledged that its previous pronouncements had failed "to adequately describe and exemplify the measures which broadcasters should undertake to promote the full realization of equal opportunity in employment for qualified individuals." [52] The Commission noted, at the same time, a widespread belief in the industry that its EEO requirements would be met so long as overt discrimination was avoided.[53] It was not until 1976 that the Commission established its model EEO program.[54] Given the traditionally broad discretion accorded the

that license renewals may be granted in reliance on post-term statistics alone. To permit exclusive reliance on such statistics would be to allow licensees to discriminate throughout the term, confident that they could secure renewal by hiring minority workers *after* the term had expired. We would not permit this; we trust that the FCC would not permit it either.

*Id.* at 246 n.42, 595 F.2d at 631 n.42 (emphasis in original). That the court was referring to purposeful discrimination is put beyond dispute by the language in the dissenting opinion to which the majority's statement was addressed:

We have held that post-term statistics may be viewed, as obviously they must, in applying the acid test to the adequacy of a licensee's affirmative action program—whether it has actually resulted in the hiring and promotion of members of the protected class. But we have refused to consider post-term statistics in examining a contention of term-time intentional discrimination.

*Id.* at 267–268, 595 F.2d at 652–653 (dissenting opinion) (footnote omitted).

46. *Los Angeles Women's Coalition v. FCC, supra* note 39, 190 U.S.App.D.C. at 110, 584 F.2d at 1092, quoting *Bilingual Bicultural Coalition v. FCC, supra* note 38, 193 U.S.App.D.C. at 115, 595 F.2d at 628 (footnote omitted).

47. *Los Angeles Women's Coalition v. FCC, supra* note 38, 190 U.S.App.D.C. at 110, 584 F.2d at 1092.

48. *Id.,* quoting *Bilingual Bicultural Coalition v. FCC, supra* note 38, 193 U.S.App.D.C. at 115, 595 F.2d at 628.

49. See note 23 *supra.*

50. Other cases cited by appellants involve either uncontested claims of discrimination, see, *e.g., Black Broadcasting Coalition v. FCC,* 181 U.S.App.D.C. 182, 556 F.2d 59 (1977), or programing rather than EEO violations, see, *e.g., Alianza Federal de Mercedes v. FCC,* 176 U.S. App.D.C. 253, 539 F.2d 732 (1976), and therefore are plainly inapposite.

51. Brief for Appellant Action for a Better Community at 31–38.

52. *Nondiscrimination of Licensee's Employment Practices,* 54 F.C.C.2d 354 (1975).

53. *Id.* at 356–357.

54. *Nondiscrimination in the Employment Policies and Practices of Broadcast Licensees,* 60 F.C.C.2d 226 (1976).

Commission,[55] we cannot say that it erred in refusing to impose forthwith the ultimate sanction of nonrenewal upon a licensee that might have been uncertain about the ramifications of agency policy.

Lastly, appellant Metro-Act urges that Rust's failures to properly ascertain and respond to community needs, along with its neglect of public affairs commitments, warrant outright denial of its renewal applications.[56] The Commission found however, that on these points Rust effectively achieved the goals erected by the Commission's rules, and concluded that short-term license renewals provided enough impetus for full compliance in the immediate future. Choice of sanction for a rule violation is an area wherein the Commission is to be indulged the widest possible latitude.[57] We are not at liberty to substitute our judgment for what appears to be a reasonable exercise of agency discretion.

The order appealed from is accordingly

*Affirmed.*

---

55. See, *e.g., Bilingual Bicultural Coalition v. FCC, supra* note 38, 193 U.S.App.D.C. at 115, 595 F.2d at 631.

56. Brief for Appellant Metro-Act of Rochester at 18–24.

57. See, *e.g., Leflore Broadcasting Co., Inc. v. FCC*, U.S.App.D.C., 636 F.2d 454, 463 (1980).